### In re GAMING LOTTERY SECURITIES LITIGATION.

**This Document Relates to: All Actions: 96 Civ. 5567(RPP), 96 Civ. 7527(RPP), 96 Civ. 7936(RPP)**

**No. 96 Civ. 5567(RPP).**

United States District Court, S.D. New York.

Feb. 23, 1999.

Wolf Popper LLP, New York City by Robert C. Finkel, Millberg Weiss Bershad Hynes & Lerach LLP, New York City by Deborah Clark–Weintraub, Lowey Dannenberg Bemporad & Selinger, PC, The Gateway, White Plains, NY by Sherrie Brown, for plaintiffs.

Proskauer Rose LLP, New York City by Edward Brodsky, for defendants.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Plaintiffs, who are purchasers of Gaming Lottery Corporation ("GLC")[1] stock allege, on behalf of a putative class, that GLC and two of its officers, Jack Banks ("Banks") and Larry Weltman ("Weltman"), violated Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 promulgated thereunder, by making materially false and misleading statements and omissions concerning GLC's acquisition of Specialty Manufacturing Inc. ("SM"), which artifically inflated the price of GLC common stock. Banks and Weltman are also accused of violating Section 20(a) of the Exchange Act as controlling persons of GLC.

Plaintiffs move, pursuant to Rule 23 of the Federal Rules of Civil Procedure, to certify a class composed of all American and Canadian persons who purchased the common stock of GLC in the American or Canadian securities markets during the period from February 1, 1995 through May 24, 1996. Defendants oppose certification of the class and move to dismiss the Canadian plaintiffs' claims for lack of subject matter jurisdiction. For the reasons that follow, plaintiffs' motion for class certification is granted and defendants' motion to dismiss the claims of the Canadian plaintiffs is denied.

## BACKGROUND

As discovery has not yet been completed, the factual allegations contained in the Consolidated Amended Class Action Complaint must be drawn on to sketch the background of this case. The following allegations contained in the Consolidated Amended Class Action Complaint were summarized by the Court in its opinion signed on May 27, 1998:

In 1995 and 1996, GLC was an Ontario corporation that manufactured products for lottery and gaming markets, operating through subsidiaries in Ontario and the United States. During the class period GLC purported to be a diversified gaming company that manufactured and supplied products to the lottery, parimutuel, bingo, and charitable gaming markets (Compl.¶ 35). The market for GLC stock was an efficient market (id. ¶¶ 32–33), and its stock trad-

---

1. Gaming Lottery was known as Laser Friendly until July 1995. All references herein will be to Gaming Lottery regardless of the time period involved.

ed on the Toronto Stock Exchange and on the NASDAQ National Market (*id.* ¶¶ 23, 32). Defendant Banks was the President, Chief Executive Officer ("CEO"), Chairman of the Board of Directors, and a controlling shareholder of GLC (*id.* ¶ 24). Defendant Weltman was the Executive Vice President, Chief Financial Officer ("CFO"), and a Director of GLC (*id.* ¶ 25).

The Complaint alleges that GLC: (1) acquired SM without obtaining the required regulatory approval from the Washington State Gambling Commission (the "Commission") (*id.* ¶ 36); (2) falsely represented to the investing public that this acquisition was completed when it was not (*id.*); (3) consolidated SM's financial results with those of GLC beginning with its fiscal 1996 first quarter results ended on April 30, 1995 (*id.* ¶¶ 36–37); and (4) because GLC deceived the Commission by misrepresenting that it had not acquired and was not operating SM, misled the investing public by making announcements of proposed acquisitions and material new gaming contracts in other states which were almost certain to fail once those state regulators learned that GLC had deceived the Commission (*id.* ¶ 40).

In June 1994 GLC, then called Laser Friendly, engaged primarily in the business of developing and marketing desktop publishing software, adopted a strategic plan to expand into gambling-related businesses through a program of acquisitions (*id.* ¶¶ 35, 44). On September 23, 1994, GLC announced the purchase of Printing Associates Inc., a New York-based supplier of lottery selection tickets and terminal rolls (*id.*). Thereafter, on November 2, 1994, GLC announced that it had entered into a letter of intent to acquire SM, a division of Ace Novelty Co., Inc. ("Ace"), a supplier of charitable and bingo game tickets or "pull tabs"

(*id.* ¶ 45), and on November 28, 1994 GLC announced that it had entered into a letter of intent to acquire Infinity Group ("Infinity"), a supplier of slot machines, video lottery terminals, and bingo products (*id.* ¶ 46). At the time, defendant Banks commented that with the acquisition of Infinity and SM, shareholders' equity would be approximately $45 million as compared to $3 million three years earlier (*id.*). On December 6, 1994, GLC and Banks announced that sales and earnings per share, for the nine months ending October 31, 1994, had increased by 43% over the same period in 1993 (*id.* ¶ 47).

On December 13, 1994, GLC announced that it had completed the sale of one million units (each consisting of a share of common stock and a warrant), as part of a previously announced international private placement involving a total of 1,875,000 units, and had received proceeds in excess of $3.78 million to be used to fund GLC's ongoing acquisition program (*id.* ¶ 48).

At the beginning of the class period, on February 1, 1995, GLC announced that it had completed the acquisition of SM subject to receipt of regulatory approval for the requisite gaming license (*id.* ¶ 62).[2] Banks commented, "we are projecting revenues of $15,000,000 for Specialty Manufacturing for the fiscal year ending January 31, 1996, adding a significant contribution to [the company's] projected revenues of $100,000,000 [for that year]. We are pleased to have consummated this acquisition by January 31, 1995 ." (*Id.*)

In February, 1995, GLC applied for a license to manufacture gambling devices in the State of Washington (*id.* ¶ 54). The Commission delayed issuing a license because GLC would not reveal who owned the Swiss bank accounts

---

**2.** Washington State law provides that a license must be obtained from the Washington State Gambling Commission ("Commission") before manufacturing, selling, or supplying gambling equipment in the state. WASH. REV. CODE § 9.46.310 (1998); WASH. ADMIN. CODE § 230–04–110 (1997).

used to supply cash as part of the international offering for the proposed purchase of SM (*id*). In mid–1995 the Commission learned that GLC had acquired SM, despite the lack of regulatory approval, and was using Ace as a "front" to operate SM, using Ace's previously obtained state license (*id*. ¶¶ 56, 63). The Commission was repeatedly told by GLC that its acquisition of SM was not completed, but the Commission determined that this was a lie (*id*. ¶ 58). In or about April, 1996, the Commission, having concluded that GLC was operating SM without a license, filed a complaint for injunctive relief against GLC (*id*. ¶¶ 41, 49, 60).[3] Ms. Mass, a Special Agent of the Commission, in an affidavit sworn to on April 15, 1996, stated that the parties to the sale had lied to the Commission in denying that the acquisition had been completed, and that an internal document obtained by the Commission, "Operational Notes for Ace Novelty—Laser Friendly Transition," instructed that, if regulators asked, they should be told that there was no change in the status of the companies, which proved their intent to defraud the Commission (*id*. ¶¶ 36, 53, 58, 63, 102; Pl. Mem. Ex. A). The Commission's action was settled on December 24, 1996 after GLC agreed to pay the Commission up to $750,000, and not to conduct business requiring licensure by the Commission for ten years (*id*. ¶ 61).

During 1995 defendants made a number of other optimistic projections regarding pending and future acquisitions, and revenue growth. During this period the price of GLC stock increased significantly. On February 13, 1995, GLC announced a plan to raise $10–20 million, through the sale of special warrants to buy a share of common stock and one half of a non-transferable purchase warrant to buy a common share, to raise $10 to $20 million to further fund its acquisi-

tion program (*id*. ¶ 64). The annual report for the fiscal year ending January 31, 1995, reported consolidated financials with SM and other acquisitions showing revenue had increased by 92%, profits by 118%, assets by 342%, and shareholder's equity by 667% (*id*. ¶ 65). On May 2, 1995 GLC also announced that it had entered into a number of supply contracts, including a contract to supply, through its subsidiary SM, gaming materials to a major Canadian gaming services corporation, YIN 88 (*id*. ¶ 66). On June 8, 1995 GLC, Banks and Weltman issued a press release reporting a revenue increase of almost 400%, for the first fiscal quarter of 1996, ending April 30, 1995, and an increase in net earnings of approximately 300%,as compared to the comparable period a year earlier (*id*. ¶ 69). This financial report consolidated the financial statements of SM with those of GLC, despite the fact that the acquisition was subject to regulatory approval and the Commission still had not granted GLC a license to operate SM (*id*. ¶ 69).

On June 27, 1995 GLC announced that it would be supplying lottery tickets and receipts for the New York State Lottery (*id*. ¶ 71). On July 7, 1995 GLC announced plans to acquire another major gaming company projected to close in August 1995 and expected to "significantly increase" earnings per share and boost shareholder equity by $35–65 million (*id*. ¶ 74). On July 11, 1995, announced that it had raised $22 million from an international private placement of 3.7 million shares (*id*. ¶ 75). On July 27, 1995, GLC announced that it had completed the acquisition of Trade Products, Inc. ("TPI") a gaming supply company located in Washington State (*id*. ¶ 80). GLC announced that this acquisition would double its revenue base in the next fiscal year (*id*). On August 14,

---

**3.** Defendants argue that, under Washington law, it was reasonable for them to believe that their operating agreement with Ace was a permissible arrangement. (Def. Reply Mem. At 6.)

1995, GLC reported plans to acquire two more gaming businesses (*id.* ¶ 83). On September 20, 1995, GLC, again including the financial results of SM, reported a 463% increase in revenues and a 263% increase in net income, for the six months ended July 31, 1995, compared with the corresponding period a year earlier (*id.* ¶ 87). Weltman stated that 80% of this increase was attributable to the acquisitions of SM and Printing Associates (*id.* ¶ 88). On December 21, 1995, GLC announced the completion of another private placement which raised $12 million for the acquisition of Stuart Entertainment Inc. (*id.* ¶ 91). On December 29, 1995, GLC again issued a consolidated financial statement for the nine months ended October 31, 1995, showing 310% growth in revenue and earnings compared to the same period in the prior year (*id.* ¶ 92). In a letter dated the same day, signed by Banks and Weltman, GLC informed shareholders that TPI revenues had not been included in the financial report because GLC was still in the process of securing necessary regulatory approvals, a process anticipated to be complete by early 1996 (*id.* ¶ 94).

On January 11, 1996, GLC announced that its negotiations with Stuart Entertainment had been put on hold pending GLC's receipt of necessary regulatory approvals from the Commission (*id.* ¶ 95). On January 30, 1996, GLC announced that its previously reported acquisition of TPI had been terminated, at TPI's initiative, because regulatory approvals had not been obtained in a timely manner (*id.* ¶ 96). At the same time it was also announced that the acquisition of Stuart Entertainment had been canceled (*id.*). Following these announcements the price of GLC stock fell sharply (Compl.¶ 96). On March 25, 1996, GLC reported financial results for the fiscal year ending January 31, 1996. The report, signed by Banks and Weltman, which again consolidated the results of SM, reported an increase in revenue of 186% and an increase in net income of 134% as compared to the previous fiscal year (*id.* ¶ 99).

On April 2, 1996, GLC announced that it planned to divest itself of all of its gaming-related subsidiaries (*id.* ¶ 101). Share prices, which had reached a high of $9.00 per share in the Summer of 1995, fell to $2.50 by May, 1996 (*id.* ¶¶ 43, 107). On April 26, 1996, it was publicly reported that Washington State gambling regulators said that GLC had secretly and illegally owned SM and operated it through Ace (*id.* ¶ 102). It was further revealed that GLC knew, in February 1995 when it had announced that the acquisition of SM, that it was not permitted to operate SM without a license, and that it knew since at least May 1995 that the Commission would not issue a license due to GLC's refusal to provide the identities of its investors (*id.*). Plaintiffs allege that, despite this knowledge, GLC and Ace entered into a secret and illegal deal whereby Ace was used as a "front" to operate SM (*id.* ¶ 103). On May 13, 1996, GLC announced that it intended to relocate to Bermuda (*id.* ¶ 104). On May 23, 1996, GLC announced quarterly results for the period ending April 30, 1996, which showed a decline in revenue to $533,404 compared to $12,028,710 for the comparable period one year earlier, and a loss in net income of $1,218,701 (*id.* ¶ 106). Revenue from SM and other gaming subsidiaries were not included in that report (*id.*)

On June 28, 1996, GLC restated its results for the prior year's fiscal quarter ending April 30, 1995, to account for the discontinued operations. As restated, revenue from continued operations was only $49,000 rather than the $12,000,000 originally reported, and a loss of $300,-000 was reported as compared to the original reports showing of $2,300,000 in income (*id.* ¶ 108). On June 29, 1996, Ontario regulators blocked GLC's move to Bermuda (*id.*).

*In re Gaming Lottery Securities Litig.,* Nos. 96 Civ. 5567(RPP), 96 Civ. 7527(RPP), 96 Civ. 7936(RPP), 1998 WL 276177, at \*1–\*4 (S.D.N.Y. May 29, 1998).

This action was commenced by a Complaint dated July 24, 1996 in the action *Pecarsky v. Banks.* By agreement of the parties, pursuant to a stipulated order dated November 12, 1996, this case was consolidated with two other actions. A Consolidated Amended Class Action Complaint was filed January 16, 1997. By its opinion signed May 27, 1998, the Court denied defendants' motion to dismiss on the pleadings and granted defendants' motion to strike one paragraph of the Amended Complaint.

## DISCUSSION

Plaintiffs have proffered six class representatives: Captain Charles Young, David Pecarsky (individually and on behalf of plaintiff Overall Supply, Inc.) and Michael Giamboi, each of whom is an American citizen, and Joel Bowen, Kevin Malakouti and Jason Shannon, each of whom is a Canadian citizen. Plaintiffs seek to certify a class consisting of all American and Canadian persons who purchased GLC stock between February 1, 1995, the date when GLC announced that it had completed the acquisition of SM, and May 24, 1996, the day after GLC restated its financial statements for the first quarter of 1996 to exclude the operations of SM.

Defendants argue that the class should not be certified because Young and Pecarsky possess interests atypical to those of the class, such that they cannot serve as adequate representatives, and because the claims of the Canadian plaintiffs do not lie within the Court's subject matter jurisdiction. Plaintiffs further claim that each of the proposed class representatives has failed to comply with discovery requests and to monitor the progress of the litigation, thereby demonstrating an inability to serve as an adequate class representative. Finally, defendants argue that even if a class is certified, the class period should be shortened to run from December 29, 1995 to April 2, 1996. A close examination of these arguments reveals that defendants' various reasons for contesting class certification are without merit.

### A. The Standard for Class Certification

To proceed with a class action, plaintiffs must show that the requirements of Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure are satisfied. The general criteria for class certification are set forth in Rule 23(a):

> One or more members of a class may sue or be sued as representative parties on behalf of all only if, (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a); *see also Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 2245, 138 L.Ed.2d 689 (1997). The third and fourth conditions, typicality of claims and adequacy of representation, may overlap in cases where a proposed representative is challenged on the grounds that he or she possesses interests antagonistic to the class. *See id.* 117 S.Ct. at 2251 n. 20.

In addition, the action must satisfy one of the requirements of Rule 23(b). Plaintiffs rely on subdivision (b)(3), which is satisfied if

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3).

### B. The American Class Representatives

Defendants claim that two of the proposed American class representatives,

Young and Pecarsky, possess claims and interests that markedly differ from those of the other class members. Specifically, defendants argue that Young is an inadequate representative because he bought and sold GLC shares more than once during the proposed class period, and that Pecarsky is an inadequate representative because he relied on third party publications when he made his purchases of GLC stock. Defendants claim that the third proposed American class representative, Giamboi, is inadequate to serve as a representative because he declined to schedule a deposition in New York during the time period allotted for depositions pursuant to the stipulated order of this Court. In fact, neither the nature of Young's transactions in GLC stock, nor Pecarsky's degree of reliance on third party publications presents a bar to class certification or to the naming of these persons as class representatives, and the issues surrounding the scheduling of Giamboi's deposition provide no basis for disqualifying him.

### 1. Plaintiff Young

Young first bought 300 shares of GLC stock on September 1, 1995. He sold those shares seven weeks later, on October 23, 1995. (Finkel Aff. Ex. A ("Young Dep.") at 72–74.) Approximately five months later, on March 26, 1996, Mr. Young purchased 500 shares of GLC stock. Then, five weeks later, on April 29, 1996, he sold those shares. (*Id.* at 88–92.) Defendants claim that "[t]his unusual 'in-and-out' trading makes Mr. Young an inadequate class representative because his claim is atypical . . . and his interests are in direct conflict with those of the class members he seeks to represent." (Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification ("Defs.' Mem. in Opp.") at 15.) Defendants' theory is that Young, as an in-and-out purchaser, has an incentive to maximize the price inflation at the moments of his purchases (September 1, 1995 and March 26, 1996) and to minimize the degree of price inflation at the time of his

sales (October 23, 1995 and April 29, 1996). Defendants argue that if GLC's stock price was artificially inflated throughout the class period, Young "would not then have been injured" because he would have sold as well as purchased at inflated prices. (*Id.*) Defendants suggest that there exists a conflict between the interests of Young and the interests of class members who sold their GLC stock at different moments or retained their stock throughout the entire class period, and who would have reason to emphasize different facts concerning the particulars of GLC's fraud and the timing of the price inflation in GLC's stock. According to defendants, Young can not simultaneously pursue both his own claim and other class members' claims with the same degree of vigor.

Defendants' position is not completely lacking in case support. The chief case relied on by defendants, *In re Seagate Technology II Securities Litigation,* considered a situation similar to the one before this Court and concluded that the conflict between in-and-out class members and other class members renders class certification problematic. 843 F.Supp. 1341, 1358–67 (N.D.Cal.1994). The *Seagate* court was required to decide whether the presence of in-and-out purchasers in the class at large, with their various conflicting interests, presents an obstacle to certification. The court decided that an evidentiary hearing was necessary to determine the relative proportion of in-and-out purchasers within the proposed class, and indicated that it would grant class certification only if "retention plaintiffs" predominated over in-and-out plaintiffs. *See id.* at 1366–67.

The position of the *Seagate* court is most decidedly the minority position. The *Seagate* court itself recognized that the conflict between the in-and-out purchaser and other class members had "been raised by defendants in numerous courts, usually to no avail." *Id.* at 1359. *Seagate* is in tension with the Ninth Circuit's decision in

*Blackie v. Barrack,* which held that this particular conflict of interest did not represent a valid reason for refusing to certify a class. 524 F.2d 891, 908–10 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). *Seagate* has also been criticized and rejected by courts within the Northern District of California and elsewhere. *See, e.g., Picard Chem., Inc. Profit Sharing Plan v. Perrigo Co.,* Nos. 1:95–CV–141, 1:95–CV–290, 1996 WL 739170, at *6 (W.D.Mich. Sept.27, 1996) ("join[ing] the majority of courts which have rejected the analysis set forth in *Seagate II,*" and citing numerous such decisions); *In re Symbol Techs. Class Action Litig.,* No. 92–CV–3492 (JG), 1996 U.S. Dist. LEXIS 3297, at *5–*6 (E.D.N.Y. Mar. 18, 1996); *Yamner v. Boich,* No. C–92–20597 RPA, 1994 WL 514035, at *7–*8 (N.D.Cal. Sept.15, 1994); *In re Scorpion Techs., Inc.,* No. C 93–20333 RPA, 1994 WL 774029, at *4–5 (N.D.Cal. Aug.10, 1994); *Welling v. Alexy,* 155 F.R.D. 654, 661–62 (N.D.Cal. 1994).

▉ The reasoning of *Seagate* is not persuasive. To succeed with a cause of action under Rule 10b–5, a plaintiff must show that " 'in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury.' " *ZVI Trading Corp. Employees' Money Purchase Pension Plan and Trust v. Ross (In re Time Warner Inc. Sec. Litig.),* 9 F.3d 259, 264 (2d Cir.1993) (citation omitted), *cert. denied,* 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994); *see also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808 (2nd Cir.1996). Distilled, the elements of a 10b–5 claim are: (1) a misstatement or omission in connection with the purchase or sale of securities; (2) materiality; (3) scienter; (4) reliance; (5) injury; and (6) a causal link between the injury and the misstatement or omission. *See In re Symbol Techs. Class Action*

*Litig.,* 950 F.Supp. 1237, 1242 (E.D.N.Y. 1997) (distilling similar list of same elements). Reliance may be presumed under the fraud-on-the-market theory when an investor relies on market price and the integrity of the market. *See Basic Inc. v. Levinson,* 485 U.S. 224, 247, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The *Seagate* court viewed price inflation as the "linchpin" of several of the above-listed elements of a 10b–5 case brought under the fraud-on-the-market theory. First, inflationary impact on market price displaces detailed proof of reliance in fraud-on-the-market cases. Second, injury depends entirely on the degree of price inflation. Third, price inflation serves as the natural causal intermediary, linking damages to the misrepresentation. *See* 843 F.Supp. at 1357. As a result of the impact of price inflation on three of the elements of a plaintiff's claim, the *Seagate* court found that "a conflict over price inflation *is* at 'the heart of the suit,' " and that conflicts over the degree of price inflation, as might arise between in-and-out purchasers and other class members, "are not only serious, but ... are pervasive enough to threaten to preclude satisfaction of the adequacy of representation element of FRCP 23." *Id.* at 1358–59.

▉ This view, however, overstates the importance of price inflation. The chief role of price inflation remains its function in determining each plaintiff's damages. The common questions with respect to whether misleading statements or omissions were made, whether such statements were material, and whether they were made with scienter, bind class members with more force than the varying questions related to price inflation drive them apart. *See Symbol,* 1996 U.S. Dist. LEXIS 3297, at *4 (rejecting *Seagate* and finding that while damages will vary according to when class members bought and sold shares, such issues did not predominate over common questions of liability); *Picard,* 1996 WL 739170, at *6 (holding that "the potential for intraclass conflict is a peripheral concern to a class whose primary interest

is in proving the materiality of the alleged omissions in an effort to prove liability"); *Nathan Gordon Trust v. Northgate Exploration, Ltd.*, 148 F.R.D. 105, 108 (S.D.N.Y. 1993) (refusing to exclude in-and-out traders from class, and observing that "[w]hile there may be a later issue as to damages for these in-and-out traders, they are still proper members of a plaintiff class"); *cf. Amchem*, 117 S.Ct. at 2250 (noting that "predominance is a test readily met in certain cases alleging consumer or securities fraud"); *Herbst v. International Tel. & Tel. Corp.*, 495 F.2d 1308, 1314 (2d Cir.1974) (holding that similar conflict between class members who continue to hold stock after class period ends and class members who sold stock does not sufficiently divide interests of class members to preclude certification).

Finally, even were the reasoning of *Seagate* persuasive to some degree, there is no showing that the conflict between Young and other class members is as acute as the conflict identified in *Seagate*. *Seagate* involved several partial curative disclosures that might have partially abated the price inflation in the stock. *See* 843 F.Supp. at 1364. Such partial disclosures have the potential to fragment a proposed class into different groups of investors with genuinely divergent interests in establishing the particular facts of a defendant's liability. Such disclosures therefore tend to maximize conflict between class members not only with respect to damages but also with respect to proof of the specific details of a defendant's fraud. *See id.* at 1364–65. The series of partial curative disclosures in *Seagate* gave rise to "greater cause for concern," *see id.* at 1364, and no similar series of curative disclosures was made by GLC.

The Second Circuit has noted that "[i]n light of the importance of the class action device in securities fraud suits, these factors [set forth in Rule 23] are to be construed liberally," *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179 (2d Cir.

1990), *cert. denied*, 498 U.S. 1025, 111 S.Ct. 675, 112 L.Ed.2d 667 (1991), and while the conflict between the in-and-out purchaser and other class members is real, it is not sufficiently severe to mark Young's claim as atypical or extinguish his ability to serve as an adequate class representative.

### 2. Plaintiff Pecarsky

Defendants argue that Pecarsky is an inadequate class representative because "his exclusive reliance on information in articles written by third parties makes him atypical and non-representative of those whose claims are based on allegedly misleading statements by GLC." (Defs.' Mem. in Opp. at 20.) Pecarsky testified at his deposition that he made his decision to buy GLC stock after reading articles in *Business Week* and *Barron's*—articles that are not attributed to specific corporate agents—and that he did not read GLC's public statements. (Finkel Aff. Ex. E ("Pecarsky Dep.") at 48–49, 59–60, 80–81, 90–93, 97–98.) According to defendants, Pecarsky is ineligible to serve as a class representative because his atypical reliance on third party publications makes his claim subject to a unique defense not shared by other class members.

■ While the existence of individualized factual questions will not always disqualify a person from serving as a class representative, it is inappropriate to name a person as a representative when he or she is subject to unique defenses that threaten to become the focus of the litigation. *See Gary Plastic Packaging*, 903 F.2d at 180; *Kline v. Wolf*, 88 F.R.D. 696, 700 (S.D.N.Y.1981), *aff'd in relevant part*, 702 F.2d 400 (2d Cir.1983); 7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure 2d § 1764 (2d ed.1986) A putative class representative's reliance on third party publications can indeed subject that person's claim to unique defenses and undermine his or her adequacy as a class representative. *See Dubowski v. Ash (In re AM Int'l, Inc. Sec. Litig.)*, 108 F.R.D. 190, 195

(S.D.N.Y.1985) ("[A] proposed class representative who clearly did not rely upon either the allegedly misleading financials or on the integrity of market price or information is subject to unique defenses, and therefore may not represent the class."); *Kline,* 88 F.R.D. at 699–700 (holding that question as to whether plaintiffs relied on company's financial reports or market integrity "afford[s] defendants the opportunity to raise unique defenses, [and] unduly burdens the class by rendering plaintiffs' claims atypical of the claims of all class members").

■ However, Pecarsky is not subject to the unique defense that he did not rely upon either misleading statements by GLC or the integrity of market price. Defendants incorrectly state that Pecarsky placed "*exclusive* reliance on information in articles written by third parties," (Defs.' Mem. in Opp. at 20 (emphasis added).) In fact, while Pecarsky did rely on articles written by third parties, the evidence suggests that he also relied on the integrity of the market and market price. Because a person is ineligible to represent a class of securities purchasers only if he "clearly did not rely upon either the allegedly misleading financials *or* on the integrity of the market price or information," *AM Int'l,* 108 F.R.D. at 195, Pecarsky remains qualified to serve as a class representative.

Regarding his first decision to buy GLC stock, Pecarsky stated in his deposition:

A: Well, I looked at the high and the low—I looked at the stock every day before I bought it, you know, as far as the trading, you know, when I checked the quotes of the particular stock

Q: So that was for a period of roughly how long before you made the purchase?

A: Probably about two, three weeks.

(Pecarsky Dep. at 94.) Pecarsky also stated that "at the time he invested" he knew "that the volume of the stock was considerable, because [he] watched the volume on it every day." (*Id.* at 99.) These portions of the deposition demonstrate that Pecarsky relied on *both* third-party reports and the efficiency of the market and the market's pricing mechanism. Pecarsky's reliance on third party publications does not disqualify him in light of the evidence that he also substantially or significantly relied upon the integrity of the market. *See Wilson v. Comtech Telecomms. Corp.,* 648 F.2d 88, 92 (2d Cir.1981) (holding that a plaintiff seeking to establish reliance need only prove that the defendant's act was "'substantial,' i.e., a significant contributing cause" of his or her injury) (citation omitted); *Panzirer v. Wolf,* 663 F.2d 365, 367 (2d Cir.1981) (holding that it is irrelevant whether or not plaintiff relied "primarily" on a third party publication and "secondarily" on the integrity of the market, and that a plaintiff will show sufficient reliance if defendant's fraud was a "substantial" or "significant contributing cause" of plaintiff's injury), *cert. granted,* 458 U.S. 1105, 102 S.Ct. 3481, 73 L.Ed.2d 1365, *cert. denied,* 458 U.S. 1107, 102 S.Ct. 3486, 73 L.Ed.2d 1368, *vacated as moot,* 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982); *AM Int'l,* 108 F.R.D. at 195 ("The fact that a purchaser may have also considered a number of other factors in making his decision to purchase does not render him subject to a unique defense, so long as he substantially or significantly relied upon either the challenged statements or the integrity of the market."); *cf. Koenig v. Benson,* 117 F.R.D. 330, 338 (E.D.N.Y. 1987) (noting that "[r]eliance on a secondary source of information does not itself make a plaintiff atypical," and finding a proposed class representative inadequate only because he did not follow stock, did not rely in any part on market price information, and relied exclusively on the advice of his son).

In light of the evidence before the Court, there is insufficient grounds to find Pecarsky inadequate to serve as a class representative.

### 3. Plaintiff Giamboi

■ Defendants contest the naming of Giamboi as a class representative, stating that "he is plainly not an adequate representative because he declined even to schedule a deposition in New York at any time during the three months available for depositions of the plaintiffs pursuant to the stipulated court order." (Defs.' Mem. in Opp. at 8 n. 4.) Plaintiffs maintain that the only reason a deposition was not scheduled was because of defendants' irrational recalcitrance regarding matters of scheduling. (Pls.' Reply Memorandum in Further Support of Motion for Class Certification ("Pls.' Reply Mem.") at 11–12.) Giamboi lives and works in Pennsylvania, and he requested to give his deposition either in Pittsburgh or by telephone, at a time convenient to defendants. (Finkel Aff. Ex. F.) Plaintiffs point out that Giamboi recently began employment as the director of an outpatient physical therapy center in Youngstown, PA, and they describe him as unavailable to travel to New York on a weekday until late January 1999. (*Id.* Ex. G.) Plaintiffs also highlight that Giamboi filed his action in Washington State and had his action transferred to New York and consolidated with *Pecarsky v. Banks* at defendants' request. (*Id.*)

Due to the reasons for the difficulty scheduling Giamboi's deposition and his apparent ability and willingness to be deposed at this time, Giamboi will be retained as a class representative. Defendants will be permitted to renew their motion to disqualify him after the taking of his deposition.

### C. *The Canadian Plaintiffs*

Defendants contend that the Court lacks subject matter jurisdiction over the claims of non-United States residents who purchased GLC stock in the Canadian securities market. As a result, defendants maintain, the four Canadian proposed class representatives who purchased GLC stock on the TSE are inadequate representatives, and the class should be narrowed to exclude any similar non-United States residents who purchased GLC stock in the Canadian securities market. Defendants' contentions are without merit. GLC may be held liable for any injuries to such foreign plaintiffs which were directly caused by GLC's considerable conduct in the United States in furtherance of securities fraud.

Neither the Exchange Act nor the Rules promulgated thereunder provide specific guidance as to the extraterritorial application of the Act. *See Itoba Ltd. v. Lep Group PLC*, 54 F.3d 118, 121 (2d Cir.1995), *cert. denied*, 516 U.S. 1044, 116 S.Ct. 702, 133 L.Ed.2d 659 (1996). The Second Circuit has articulated two tests to guide courts in deciding when extraterritorial application of the Act is warranted: the "conduct test" and the "effect test." *See id.* at 121–22. The Second Circuit has made clear that "[t]here is no requirement that these two tests be applied separately and distinctly from each other," and that "an admixture or combination of the two often gives a better picture of whether there is sufficient United States involvement to justify the exercise of jurisdiction by an American court." *Id.* at 122.

■ Under the conduct test, federal jurisdiction will lie if two requirements are met: (1) the defendants' activities within the United States are more than "merely preparatory," *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 987 (2d Cir.), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975); and (2) these activities (or omissions) "'directly caused'" the plaintiff's losses, *Itoba*, 54 F.3d at 122 (citation omitted). A loss is "directly caused" if the defendant's actionable misstatement or omission within the United States is a "substantial" or "significant contributing cause" of the decision to purchase stock. *See id.* at 122; *Wilson*, 648 F.2d at 92.

■ Defendants committed several acts within the United States which were more than merely preparatory and which allegedly directly caused the Canadian

plaintiffs losses. Plaintiffs' Consolidated Amended Class Action Complaint revolves around GLC's acquisition of United States companies, and, in particular, the acquisition of SM, which was a division of Ace novelty, a Washington corporation. The core of plaintiffs' complaint is that GLC made announcements of increases in earnings and stockholder equity incorporating SM's financials during a time when it had not truly completed the acquisition of SM and was, in fact, operating SM without regulatory approval and with knowledge that regulatory approval would not be forthcoming due to GLC's refusal to provide the Washington State Gambling Commission with the identities of investors in the international private placement which financed the purchase of SM. The Commission determined that in the interim, GLC had deliberately deceived it about the acquisition and operation of SM, and GLC was compelled to settle a lawsuit brought by the Commission for $750,000 and the promise not to conduct the business of SM or any other business requiring licensure by the Commission for ten years. (See *supra* pp. 65–66.) These activities, which are alleged to have impacted the price of GLC stock in Canadian as well as American securities markets, constitute sufficient conduct within the United States to support subject matter jurisdiction. GLC is alleged to have illegally operated a United States subsidiary in the United States, and incorporated the earnings of this subsidiary in its financial statements when the operation of the subsidiary was sustainable only as long as GLC continued to deceive the Washington State Gambling Commission. GLC's United States conduct was far more than "merely preparatory" to the fraud; its activities within this nation's borders are the very factual predicates of fraud which lie at the heart of plaintiffs' case.

Nor is there much doubt that these United States-based activities, if proven, could be shown to have directly caused the Canadian plaintiffs' injuries. As alleged in the Amended Complaint, the misstatements and omissions surrounding the acquisition and operation of SM artificially inflated the price of GLC stock on the TSE as well as the NASDAQ, directly causing injury to non-United States residents who purchased stock on the TSE. Both elements of the conduct test are met in this case, as plaintiffs have charged GLC with committing fraudulent acts in the United States directly causing injury abroad.

The Second Circuit has recently indicated that even when the conduct test is fully satisfied, "some additional factor tipping the scales in favor of our jurisdiction" sometimes may be required. *See Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London,* 147 F.3d 118, 129 (2d Cir.1998), *cert. denied,* 67 U.S.L.W. 3351 (U.S. Feb.22, 1999) [hereinafter *EOC* ]. In *EOC,* the Second Circuit found that some tipping factor was necessary "because the surrounding circumstances show[ed] that no relevant interest of the United States was implicated." *Id.* at 129; *see also Interbrew, S.A. v. Edperbrascan Corp.,* 23 F.Supp.2d 425, 432 (S.D.N.Y. 1998) (stating that the Second Circuit required a tipping factor for this reason). *EOC* involved fraudulent conduct with a far more tenuous connection to the United States than that present in the litigation before this Court. The only United States connection in *EOC* was the fact that the plaintiff, a foreigner, had been in Florida when he received phone calls and facsimiles from another foreigner concerning the purchase of foreign securities. The Second Circuit noted that in the past it had found jurisdiction when in addition to communications or meetings in the United States, there also had been a transaction on a United States exchange, economic activity in the United States, harm to a United States party or activity by a United States person or entity, *see* 147 F.3d at 130, and it held, specifically, that absent such other factors, "a series of calls to a transient foreign national in the United States is not enough to establish jurisdic-

tion under the conduct test without some additional factor tipping the scales in favor of our jurisdiction." *id.* at 129.

The activities by GLC which satisfy the conduct test relate to the illegal operation of a United States subsidiary on United States soil and the deception of a United States regulatory commission, and present a much closer nexus to the United States than telecommunications with a transient foreigner which coincidentally occurred within this country. This raises the question whether it is even necessary to look into the existence of additional tipping factors—a question which need not be decided in light of the constellation of facts which tie this case to the United States and easily tip in favor of jurisdiction in any case. The activities of GLC are alleged to be part of a single fraudulent scheme which included misstatements and omissions in both countries and the inflation of GLC's stock price on both Canadian and American exchanges. Due to the efficiencies of market pricing and the ever-present possibility of arbitrage, the price of GLC stock on the TSE and the NASDAQ unsurprisingly moved in tandem during the class period. (Clark–Weintraub Decl. Ex. B.) Almost half of GLC's assets identified in its 1996 Annual Report were located in the United States (*id.* Ex. C at 13), over two-thirds of its revenues reported in the 1996 Annual Report were generated by United States operations (*id.* Ex. C at 12), and as of April 15, 1996, a little more than 51% of GLC's outstanding common shares were registered in the names of United States residents. (*Id.* Ex. D. at 14.) Subject matter jurisdiction is thus supported by substantial fraudulent activity in the United States directly causing harm abroad, the manner in which the same fraudulent scheme allegedly straddled both sides of the border, and the degree of economic activity connecting GLC to the United States.

The chief cases within this Circuit relied on by defendants in addition to *EOC*, *Nathan Gordon Trust v. Northgate Explora-tion, Ltd.*, 148 F.R.D. 105 (S.D.N.Y.1993), and *Interbrew S.A. v. Edperbrascan Corp.*, 23 F.Supp.2d 425 (S.D.N.Y.1998), do not control the outcome of this case.

*Nathan Gordon* involved alleged misrepresentations by a Canadian company about the potential profitability of a Canadian gold mine. *See* 148 F.R.D. at 106. The court struck from the class all persons with claims arising from transactions on Canadian and British exchanges on the grounds that "the relevant 'conduct' ... occurred in Canada where the alleged misleading information was authored." *Id.* at 108. This reasoning has been strongly criticized by the Second Circuit. *See Itoba*, 54 F.3d at 124 (holding that the situs where allegedly fraudulent SEC filings were prepared should not be determinative of jurisdictional questions). Moreover, unlike the case at bar, the fraud in *Nathan Gordon* concerned the potential profitability of a Canadian asset, rather than a series of actions taken in the United States involving an American subsidiary and an American regulatory authority.

*Interbrew* held that jurisdiction under the Exchange Act did not extend to a Canadian plaintiff who "placed special reliance ... on statements made in ... financial statements filed with the SEC" because the sole additional "tipping factor" was the possession of American assets. 23 F.Supp.2d at 431–32. In *Interbrew*, a Belgian plaintiff sued a Canadian defendant for losses sustained in connection with the purchase of a Canadian subsidiary of the defendant on a Canadian stock exchange. *See id.* at 429. There was no alleged effect on a United States affiliated company and the court noted that although 25% of the stockholders of the subsidiary were American, they were not the intended victims of the alleged fraudulent scheme and they did not end up being actual victims of the alleged fraudulent scheme. *See id.* at 430. The fraudulent activity allegedly engaged in by GLC within the United States stands in sharp contrast to the mere filing of SEC statements with no intention to victimize

American shareholders, suggesting that there may be no need to search for additional "tipping factors" as there was in *Interbrew*. In any case, the factors weighing in favor of jurisdiction in this case extend beyond GLC's mere ownership of American assets, and relate to an alleged fraudulent scheme in which persons purchasing on American and Canadian exchanges were, in similar measure and in similar fashion, the intended as well as the actual victims of an integrated fraudulent scheme.

The assumption of jurisdiction in this case is consistent with established principles of American and international law and grounded in the close nexus between alleged fraudulent activity in the United States and injury to persons abroad.

### D. *Plaintiffs' Fulfilment of Their Duties as Class Representatives*

Defendants argue that the proposed class representatives have displayed an indifference toward their minimal obligations as plaintiffs, rendering them inadequate to serve as representatives of the proposed class. Specifically, defendants contend that plaintiffs have failed to comply with discovery requests, neglected to review court documents, filed certifications without carefully reviewing their contents, and not participated in the preparation of key documents. (Defs.' Mem. in Opp. at 4–11.) Plaintiffs argue that these contentions are contradicted by the record, and, in any event, insufficient to defeat class certification. (Pls.' Reply Mem. at 17–18.)

A class representative is a fiduciary to the class and bears a responsibility to comply with discovery requests, *see AM Int'l*, 108 F.R.D. at 197; *Kline*, 88 F.R.D. at 700, to possess a basic knowledge of the facts, *see Koenig*, 117 F.R.D. at 337, and to participate to some minimal degree in the lawsuit "to ensure that the party is not simply lending his name to a suit controlled entirely by the class attorney." 7A Wright, Miller & Kane, *supra* p. 14, § 1766, at 310–11. The participation of plaintiffs in this case has not been so minimal as to indicate a virtual abdication to the attorneys of the conduct of the case, *see Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 728 (11th Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988), and the plaintiffs are not charged with the type of "glaring violations of the discovery rules," *AM Int'l*, 108 F.R.D. at 197, that have led to the disqualification of class representatives in cases such as *Darvin v. International Harvester Co.*, 610 F.Supp. 255 (S.D.N.Y.1985) (refusal to answer relevant questions at both deposition sessions), *Kline*, 88 F.R.D. at 700 (refusal to answer relevant questions as to whether plaintiff would have purchased shares had she known of information contained in Annual Report), and *Norman v. Arcs Equities Corp.*, 72 F.R.D. 502, 506 (S.D.N.Y.1976) (finding plaintiff inadequate class representative, in part, on the basis of plaintiff's failure to answer deposition questions responsively).

Accordingly, none of the proposed class representatives will be disqualified on the grounds of failure to fulfil the fiduciary obligations of a class representative.

### E. *The Length of the Class Period*

Defendants seek to narrow the class period to run from December 29, 1995 to April 2, 1996, rather than from February 1, 1995 to May 24, 1995. (Defs.' Mem. in Opp. at 24–30). Granting this request would require the Court to examine the details and validity of plaintiffs' claim, and to ignore the rule pronounced in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) that the court should not inquire into the merits of a class action suit prior to class certification. The Second Circuit has stated that while the merits of a claim may be considered to the extent they indirectly bear upon the four requirements of Rule 23(a), it is improper "to resolve substantial questions of fact going to the merits when deciding the scope or time limits of the class." *Sirota v. Solitron Devices, Inc.*,

673 F.2d 566, 572 (2d Cir.1982) (citing *Professional Adjusting Systems of America, Inc. v. General Adjustment Bureau, Inc.,* 64 F.R.D. 35, 38 (S.D.N.Y.1974)), *cert. denied,* 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982). Whether claims falling outside some narrower time window within the class period are, in fact, groundless on the merits is a question of fact for the jury that should not be answered when the court decides whether to certify a class. *See id.* at 570–72; *Nathan Gordon,* 148 F.R.D. at 108 (certifying broader class period and declining to rule on factual issue of whether a curative disclosure should shorten the class period). Defendants have not cited cogent reasons to avoid this rule, and, as a consequence, their motion to shorten the class period is denied.

## CONCLUSION

For the foregoing reasons, the Court grants plaintiffs' motion to certify a class consisting of all persons who purchased GLC common stock in the American or Canadian securities markets between February 1, 1995 and May 24, 1996, other than the defendants, members of their immediate families, any subsidiary, affiliate or control person of any such person or entity, officers, directors and employees of GLC, and the legal representatives, heirs, successors or assigns of any such excluded party. Defendants' motion to dismiss the claims of the Canadian plaintiffs is denied.

IT IS SO ORDERED.