**TRI-STAR FARMS LTD.** and the City of Miami Fire Fighters' and Police Officers' Retirement Trust Fund, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**MARCONI, PLC, Roger Hurn, George Simpson, John Mayo, and Steve Hare, Defendants.**

Civil Action No. 01–1259.

United States District Court,
W.D. Pennsylvania.

Sept. 18, 2002.

Alfred G. Yates, Jr., Gerald L. Rutledge, Pittsburgh, PA, Sherrie R. Savett, Stuart J. Guber, Douglas M. Risen, Berger & Montague, Philadelphia, PA, for Plaintiffs.

Patrick J. McElhinny, David A. Brownlee, Thomas R. Johnson, Kirkpatrick & Lockhart, Pittsburgh, PA, for Defendants.

## MEMORANDUM

LANCASTER, District Judge.

This is a class action in which plaintiffs allege defendants violated of the federal securities laws. Plaintiffs argue that defendants artificially inflated the market price for Marconi, PLC ("Marconi") securities by issuing fraudulently false and misleading statements in violation of section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240–10b–5. Plaintiffs also contend that the individual defendants are liable as controlling persons under section 20(a) of the Exchange Act for Marconi's alleged violations of section 10(b). Plaintiffs seek money damages.

Defendants have filed a motion to dismiss the Consolidated Amended Class Action Complaint ("Complaint")[1] pursuant to Fed.R.Civ.P. 12(b)(1) and (6). First, defendants argue that this court lacks subject matter jurisdiction over named plaintiff Tri–Star Farms, Ltd. ("Tri–Star") and any other foreign purchasers of Marconi ordinary shares because their claims are predicated on the purchase of the securities of a foreign company on a foreign exchange and based on the conduct of foreign citizens in a foreign country. Second, defendants argue that the Complaint should be dismissed in its entirety for failure to state a claim upon which relief may be granted.[2]

Plaintiffs oppose defendants' motion, arguing that the court has subject-matter jurisdiction over the claims of all plaintiffs, including those who purchased Marconi ordinary shares on the London Stock Exchange, because defendants engaged in extensive fraud-related conduct in the United States. Plaintiffs further argue that the Complaint, read in the light most favorable to them, provides sufficient factual support and particularity to survive defendants' motion to dismiss for failure to state a claim upon which relief can be granted.

## I. BACKGROUND

Plaintiffs seek to bring this action on behalf of a class comprised of all purchasers of the ordinary shares[3] and American

---

**1.** In an order dated October 22, 2001, this court consolidated six previously-filed actions at Civ. A. No. 01–1259 and appointed Tri–Star Farms, Ltd. and the City of Miami Fire Fighters' and Police Officers' Retirement Trust Fund lead plaintiffs. Pursuant to the October 22, 2001 order, plaintiffs filed a Consolidated Amended Class Action Complaint on December 21, 2001. It is this complaint that defendants are moving to dismiss.

**2.** Defendant Roger Hurn ("Hurn") did not participate in bringing the initial motion to dismiss because, at the time it was filed, he

had not yet been served with process and, accordingly, had no obligation to respond to the Complaint. Defendant Hurn subsequently was served and, on July 22, 2002, filed a separate *Motion to Dismiss the Consolidated Class Action Complaint*. In his motion, Hurn adopts and incorporates by reference the motion to dismiss and supporting brief filed by the other defendants in this case. This Memorandum applies equally to both motions to dismiss.

**3.** "Ordinary shares" are the British equivalent of common stock.

Depository Receipts ("ADRs")[4] of Marconi between April 10, 2001, the date of the first alleged misrepresentation, and July 5, 2001, the day after Marconi suspended all trading in its shares and issued a profit warning (the "class period"). Named plaintiff Tri–Star Farms Ltd., a foreign corporation, allegedly purchased Marconi ordinary shares at artificially inflated prices during the class period and was damaged thereby. Named plaintiff the City of Miami Fire Fighters' and Police Officers' Retirement Trust Fund allegedly purchased Marconi ADRs at artificially inflated prices during the class period and was damaged thereby. The putative class seeks remedies under the Exchange Act.

Defendant Marconi is a United Kingdom corporation with its executive offices and principal place of business located in London, United Kingdom. According to Marconi's SEC filings, as of August 31, 2000, Marconi had 2.76 billion ordinary shares outstanding. Holders of only 0.15% of those shares are residents of the United States. Marconi ordinary shares trade on the London Stock Exchange. Marconi's ADRs were registered with the SEC and traded in the United States on the NASDAQ market. As of August 31, 2000, Marconi ADRs accounted for approximately 1% of Marconi's total issued share capital. Virtually all holders of Marconi ADRs are United States residents.

The individual defendants are Roger Hurn, Marconi's former Chairman; George Simpson, Marconi's former Chief Executive Officer; John Mayo, Marconi's former Finance Director and Deputy Chief Executive; and Steve Hare, Marconi's Chief Financial Officer.

According to the complaint, Marconi is a global communications and information technology company that supplies advanced communication solutions and key technologies and services for the Internet. The complaint alleges, *inter alia,* that toward the end of 2000, Marconi's competitors began announcing that the market for telecommunications equipment had collapsed. Although these competitors issued profit warnings and drastically reduced earnings estimates and major Marconi customers warned that they intended to cut capital expenditures, Marconi reassured investors during the class period that its revenues would rise. Marconi also claimed that its geographic and business mix left it relatively immune from the economic downturn and that, unlike its competitors, it saw no need to change its guidance. Plaintiffs allege that these assurances were false and misleading and made without a reasonable basis.

The specific false and misleading statements which form the basis of plaintiffs' complaint were contained in two Form 6–Ks filed with the SEC on April 10 and May 17, 2001[5]; and in articles published in the

---

**4.** "An ADR is a receipt issued by a depository bank that represents a specified amount of a foreign security that has been deposited with a foreign branch or agent of the depository, known as the custodian. The holder of an ADR is not the title owner of the underlying shares; the title owner of those shares is either the depository, the custodian, or their agent. ADRs are tradeable in the same manner as any other registered American security, may be listed on any of the major exchanges in the United States or traded over the counter, and are subject to the federal securities laws. This makes trading an ADR simpler and more secure for an American investor

than trading in the underlying security in the foreign market." *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 367 (3d Cir.2002) (citations omitted). Marconi's ADRs are traded on the NASDAQ market, and each Marconi ADR represents two Marconi ordinary shares.

**5.** The SEC requires foreign issuers registered under the Exchange Act to file on Form 6–K information and material made available to stockholders pursuant to foreign law, stock exchange regulations, or otherwise distributed to security holders. *See* Exchange Act Rule 13a–16(a), 17 C.F.R. § 240.13a–16(a); *see also* Harold S. Bloomenthal & Samuel

Financial Times (London) on April 11, May 18, and June 19, 2001.

On July 4, 2001, Marconi suspended all trading in its shares on the London Stock Exchange for the day while its board met. At the end of the trading day, Marconi belatedly issued a profit warning, disclosing that sales for the year would be fifteen percent lower than the previous year and that its operating profit before exceptional items would be down approximately fifty percent for the year ending March 31, 2002.

Plaintiffs allege that this disclosure of Marconi's true financial condition was devastating to Marconi's shareholders. When trading resumed on July 5, 2001, the price of Marconi's ordinary shares dropped by over fifty percent. Similarly, Marconi's ADRs dropped, on extraordinarily heavy trading volume, from a closing price of $7.03 on July 3, 2001 to a closing price of $3.35 on July 5, 2001.

The complaint alleges that, due to defendants' deceptive and illegal conduct, plaintiffs and the other putative class members purchased their Marconi ordinary shares and/or ADRs at grossly inflated prices and were damaged thereby.

## II. DISCUSSION

### A. Subject Matter Jurisdiction

#### 1. Standard of Review

■ When a court considers a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)"), it must first determine whether the defendant is making a facial or factual jurisdictional attack. In a facial jurisdictional attack, where the defendant asserts that the allegations of the complaint are insufficient to establish jurisdiction, the court must consider the allegations of the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). In a factual jurisdictional attack, where the defendant argues that the court lacks jurisdiction based on evidence outside of the pleadings, the standard of review is very different. "Because at issue in a factual 12(b)(1) motion is the trial court's [actual] jurisdiction—its very power to hear the case—[rather than simply the sufficiency of plaintiff's allegations] there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Mortensen,* 549 F.2d at 891. Thus, when presented with a factual 12(b)(1) motion, the court may consider evidence outside of the pleadings, *id.,* and need only accept the plaintiffs' uncontroverted allegations as true, *Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1583 (Fed.Cir.1993)(citing *Gibbs v. Buck,* 307 U.S. 66, 72, 59 S.Ct. 725, 83 L.Ed. 1111 (1939) and 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §§ 1350, 1363, at 219–20, 457 (2d ed.1990)).

#### 2. Subject–Matter Jurisdiction Under the Exchange Act

■ The primary issue in this case involves the extraterritorial reach of the federal securities laws. Specifically, the court must decide whether the Exchange Act confers upon it subject-matter jurisdiction over the claims of Tri–Star and any other foreign class members who purchased ordinary shares of Marconi, a foreign company, on the London Stock Exchange.[6]

---

Wolff, *Securities and Federal Corporate Law* § 27:244 (2d ed.2001). This material includes press releases. *See id.* The April 10 and May 17, 2001, Form 6–Ks at issue in this case incorporate verbatim press releases is-

sued in the United Kingdom on those same dates.

6. Defendants do not challenge the court's subject-matter jurisdiction over the claims of the City of Miami Fire Fighters' and Police

Defendants argue that the court lacks subject-matter jurisdiction over such putative class members because the federal securities laws do not apply to claims of foreign purchasers of securities of a foreign company on a foreign exchange based on conduct of foreign citizens that took place exclusively in a foreign country. Defendants contend that all of the alleged wrongful conduct in this case took place in the United Kingdom and that a finding of subject-matter jurisdiction in this action would establish a predicate for United States regulation of all foreign securities markets, vastly expanding the number of securities class actions that could be filed in United States courts.

Plaintiffs disagree, arguing that some of defendants' wrongful conduct occurred in the United States and that conduct is sufficient to establish subject-matter jurisdiction over all of the putative class members including foreign purchasers of Marconi ordinary shares. Plaintiffs primarily point to alleged false and misleading statements contained in two Form 6–Ks Marconi filed with the SEC during the class period. Plaintiffs claim that these misrepresentations significantly advanced defendants' fraudulent scheme to mislead investors.

After careful review of the pleadings of record, defendants' motion to dismiss, the briefs filed in support thereof and opposition thereto, the arguments of counsel, and applicable case law, we find that jurisdiction under the Exchange Act does not extend to Tri–Star or any other non-resident foreign purchasers of Marconi ordinary shares. The reasons for the decision follow.

*a. Governing Legal Standard*

■ The question presented is whether Marconi's alleged wrongful conduct within the United States is sufficient to establish subject-matter jurisdiction under the Exchange Act over the claims of foreign purchasers of Marconi ordinary shares on a foreign exchange. In cases such as this "[w]hen a court is confronted with transactions that on any view are predominantly foreign, it must seek to determine whether Congress would have wished the precious resources of the United States courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign countries." *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 985 (2d Cir.1975).

Section 27 of the Exchange Act vests federal courts with exclusive jurisdiction over actions involving violations of the Act as well as the rules and regulations adopted thereunder. *See* 15 U.S.C. § 78aa. Although the preamble to the Exchange Act expressly contemplates its application to transactions in "interstate and foreign commerce," *see* 48 Stat. 881 (1934), the specific provisions of the Act itself are silent with respect to the statute's extraterritorial reach. Similarly, the Act's legislative history is silent with respect to the questions of jurisdictional scope at issue here. *See SEC v. Kasser*, 548 F.2d 109, 114 n. 21 (3d Cir.1977).

■ In the absence of clear statutory guidance, courts have attempted to discern Congress' intent with respect to the extraterritorial jurisdiction of the federal securities laws in transnational fraud cases. *See Bersch*, 519 F.2d at 993 ("Our conclusions rest on ... our best judgment as to what Congress would have wished if these problems had occurred to it."). In so doing,

Officers' Retirement Trust Fund or the putative class of persons who purchased Marconi ADRs on the NASDAQ market during the class period. This would include foreign as well as American purchasers of Marconi ADRs. As explained *infra*, the court agrees that it has subject-matter jurisdiction over these persons under the Exchange Act.

the courts have developed two basic tests for subject matter jurisdiction—the "effects test" and the "conduct test." *See Robinson v. TCI/US W. Communications Inc.*, 117 F.3d 900, 905 (5th Cir.1997). The "effects test" considers whether conduct outside the United States has had a substantial adverse effect on United States investors or United States securities markets. *See id.* The "conduct test" looks at whether conduct within the United States is alleged to have played some part in the perpetration of a securities fraud on investors outside of this country. *See id.* Satisfaction of either test may independently establish jurisdiction. *See id.*

Jurisdiction over Tri–Star and other non-resident foreign purchasers of Marconi ordinary shares cannot be premised on domestic "effects" of foreign conduct.[7] These investors were not American investors, they did not purchase their securities on an American exchange, and they did not suffer the effects of Marconi's alleged conduct within the United States. Therefore, there is no domestic effect of Marconi's conduct in relation to these plaintiffs. Accordingly, we must look to Marconi's conduct within the United States in determining whether we have jurisdiction over these plaintiffs' claims. Before doing so, however, we must consider what degree of domestic conduct will suffice to establish jurisdiction under the Exchange Act.

One of the early and influential cases to address this issue is the opinion of the Court of Appeals for the Second Circuit in *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir.1975). *Bersch* was a class action brought on behalf of common stockholders of IOS, Ltd., a Canadian corporation, whose main office was in Switzerland, and whose stock was traded on foreign exchanges. *See id.* at 977–80. Plaintiffs alleged violations of the Exchange Act and the Securities Act of 1933 stemming from losses they incurred after purchasing IOS stock as part of a public offering. *See id.* at 981. The complaint alleged, *inter alia,* that underwriters impliedly represented to the public that IOS was a suitable company for public offering when they should have known that it was not. *See id.* Plaintiffs also alleged that prospectuses failed to reveal illegal activities by IOS and its officers and that various IOS officials falsely touted IOS's prospects in the months preceding the offering. *See id.*

In *Bersch,* the court of appeals was called on to decide whether subject matter jurisdiction existed "with respect not only to the relatively few Americans who had purchased IOS shares but to the many thousands of foreign purchasers whom plaintiff sought to represent." *Id.* at 986. After a lengthy analysis, the court of appeals concluded that the anti-fraud provisions of the federal securities laws "[d]o not apply to losses from sales of securities to foreigners outside the United States unless acts (or culpable failures to act) within the United States directly caused such losses." *Id.* at 993. Applying this standard, the court concluded that defendants' conduct within the United States was not sufficient to extend subject-matter

---

7. In contrast, we do have jurisdiction over the *City of Miami Fire Fighters'* and *Police Officers' Retirement Trust Fund* and other Marconi ADR holders because most, if not all, of the Marconi ADR holders were United States residents and the ADRs were traded on the NASDAQ market. Thus, defendants' alleged conduct had a substantial adverse effect on United States investors and a United States securities market. Jurisdiction likewise would extend to any United States purchasers of Marconi ordinary shares. The foreign purchasers of Marconi ordinary shares, however, cannot bootstrap their losses to these independent American losses to justify jurisdiction under an effects theory. *See, e.g., McNamara v. Bre–X Minerals Ltd.*, 32 F.Supp.2d 920, 923–24 (E.D.Tex.1999); *Kaufman v. Campeau Corp.*, 744 F.Supp. 808, 810 (S.D.Ohio 1990).

jurisdiction to foreign purchasers of the foreign securities at issue. *See id.* at 987.[8] In reaching this holding, the court explained that although conduct within the United States may be sufficient to confer jurisdiction in some cases, jurisdiction over foreign plaintiffs does not lie in "cases where the United States activities are merely preparatory or take the form of culpable nonfeasance and are relatively small in comparison to those abroad." *Id.*

Shortly after the *Bersch* decision, the Court of Appeals for the Third Circuit addressed the extraterritorial reach of the Exchange Act in two cases involving solely foreign victims—*Straub v. Vaisman & Co.*, 540 F.2d 591 (3d Cir.1976) and *SEC v. Kasser*, 548 F.2d 109 (3d Cir.1977). These remain the only two opinions in which the Court of Appeals for the Third Circuit has directly addressed this issue.

*Straub* was a suit brought by European plaintiffs against, *inter alia,* a registered securities broker-dealer in New Jersey alleging fraudulent conduct in connection with the sale of certain securities. *See Straub,* 540 F.2d at 593–94. *Kasser* was a suit brought by the SEC against certain individuals and corporations alleging that defendants engaged in a scheme to defraud and make misrepresentations to a Canadian corporation with respect to the purchase and sale of various securities. *See Kasser,* 548 F.2d at 110–11. In *Kasser,* the court recognized the Second Circuit's decisions in *Bersch* and its companion case, *IIT v. Vencap, Ltd.,* 519 F.2d 1001 (2d Cir.1975), as the then-leading opinions on the problem of jurisdiction in transnational securities fraud cases. *See Kasser,* 548 F.2d at 113; *see also Straub,* 540 F.2d at 595 (citing *Bersch* and *IIT*). In both *Straub* and *Kasser,* the court of appeals held that, based on the facts as alleged in the complaint, it had jurisdiction under the securities laws even though foreign individuals or corporations were the only victims of the fraud. *See Straub,* 540 F.2d at 595; *Kasser,* 548 F.2d at 115–16.

Because it involved a closer factual question, the court of appeals discussed the jurisdictional issue in greater depth in *Kasser* than in *Straub.* In *Kasser,* after discussing the decisions in *Bersch* and *IIT,* the court of appeals rejected defendants' argument that at least some impact or "effect" in this country is a prerequisite to jurisdiction over extraterritorial securities transactions. *Kasser,* 548 F.2d at 113 (agreeing with *Bersch* and *IIT* on this point). The court did not think that "Congress intended to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners." *Id.* at 114 (quoting *IIT,* 519 F.2d at 1017). Rather, in the court's view, "[t]he federal securities laws ... do grant jurisdiction in transnational securities cases where at least some activity designed to further a fraudulent scheme occurs within this country." *Id.* Consequently, the court "decline[d] to immunize, for strictly jurisdictional reasons, defendants who unleash from this country a pervasive scheme to defraud a foreign corporation." *Id.*

In addition to the above analysis, the court of appeals set forth several policy reasons supporting its decision. *See id.* at 116. First, the court stated that "to deny such jurisdiction may embolden those who wish to defraud foreign securities purchasers or sellers to use the United States as a base of operations." *Id.* The court felt

---

8. The United States conduct in *Bersch* included, *inter alia,* meetings of attorneys, underwriters, and accountants in New York to initiate, organize, and structure the offering at issue; retention of a New York law firm to represent the underwriters; and meetings with the SEC. *See Bersch,* 519 F.2d at 985 n. 24.

that a finding of no jurisdiction on the facts of the case before it "would, in effect, create a haven for such defrauders and manipulators." *Id.* The court was "reluctant to conclude that Congress intended to allow the United States to become a 'Barbary Coast,' as it were, harboring international securities 'pirates.'" *Id.*

Second, the court was "concerned that a holding of no jurisdiction might induce reciprocal responses on the part of other nations." *Id.* By finding jurisdiction in cases such as the one before it, the court hoped to encourage other nations to take appropriate steps against "fraudulent schemes aimed at the United States from foreign sources." *Id.*

Third and finally, the court reiterated its opinion that the securities acts were designed to "insure high standards of *conduct* in securities transactions within this country," not just to protect domestic markets and investors from the *effects* of fraud. *Id.* (emphasis added). The court explained that finding jurisdiction would "enhance the ability of the SEC to police vigorously the conduct of securities dealings within the United States." *Id.*

The parties in the present case differ in their interpretations of the court of appeals' holdings in *Straub* and *Kasser.* Plaintiffs argue that the court of appeals applied a less strict standard in *Straub* and *Kasser* than the Court of Appeals for the Second Circuit in *Bersch* applied with respect to the degree of conduct within the United States necessary to confer jurisdic-

tion over securities fraud claims brought by foreign plaintiffs. In particular, plaintiffs argue that the Court of Appeals for the Third Circuit does not require proof that domestic activity *directly caused* plaintiffs' alleged loss. Rather, quoting from *Kasser,* plaintiffs contend that the standard in this circuit is that jurisdiction exists any time "at least some activity designed to further a fraudulent scheme occurs within this country" regardless of whether or not that activity directly caused plaintiffs' loss. *See Kasser,* 548 F.2d at 114.[9]

Defendants disagree with plaintiffs' interpretation of Third Circuit precedent, pointing out that the court of appeals in both *Kasser* and *Straub* cited *Bersch* and other Second Circuit decisions with approval and arguing that the *Kasser* and *Straub* courts based their jurisdictional analyses on those decisions.

We agree with defendants that the Court of Appeals for the Third Circuit did not reject outright the reasoning of the Court of Appeals for the Second Circuit with respect to the jurisdictional issues now before us. To the contrary, as discussed above, the court in *Kasser* cited both *Bersch* and *IIT* in support of its analysis and expressly recognized the Second Circuit as having a particular expertise in the area of securities law. *See Kasser,* 548 F.2d at 115 ("In sum, the prior pronouncements of this Court and those of the Second Circuit, a court with especial expertise in matters pertaining to securi-

9. Other courts of appeals share plaintiffs' view that the Court of Appeals for the Third Circuit applies a more relaxed standard than that espoused by the Court of Appeals for the Second Circuit in *Bersch* and other cases. *See, e.g., Robinson v. TCI/US W. Comm. Inc.,* 117 F.3d 900, 906 (5th Cir.1997) ("The Third, Eighth, and Ninth Circuits, in contrast, generally require some lesser quantum of conduct. To the extent that these cases represent a common position, it appears to be that the

domestic conduct need be only significant to the fraud rather than a direct cause of it."); *Kauthar SDN BHD v. Sternberg,* 149 F.3d 659, 666 (7th Cir.1998) (same); *Zoelsch v. Arthur Andersen & Co.,* 824 F.2d 27, 31 (D.C.Cir. 1987) ("The Third, Eighth, and Ninth Circuits appear to have relaxed the Second Circuit's test."); *Grunenthal GmbH v. Hotz,* 712 F.2d 421, 424 (9th Cir.1983). These opinions, of course, are not binding on this court.

ties, lend great support for a holding of jurisdiction here.").

Moreover, the court in both *Kasser* and *Straub* was quick to point out that the conduct at issue in those cases likely would satisfy *Bersch's* direct causation requirement. *See Straub*, 540 F.2d at 595 ("Wherever the jurisdictional line is to be drawn, we entertain no doubt that application of federal law is proper, in this instance ..." (citation omitted)); *Kasser*, 548 F.2d at 115 ("Not only do we believe that the sum total of the defendants' intranational actions was substantial, but we also question whether it can be convincingly maintained that such acts within the United States did not directly cause any extraterritorial losses.").

We disagree with defendants, however, that the *Kasser* and *Straub* opinions mandate a showing of direct causation to establish jurisdiction. Rather, as stated above, the United States-based conduct in *Straub* and *Kasser* was so extensive that jurisdiction was likely proper under any standard, including that applied in *Bersch*. Thus, the facts in *Straub* and *Kasser* did not require the court of appeals to decide the issue of whether direct causation is a necessary element of the "conduct test."

As plaintiffs point out, some of the language in *Straub* and *Kasser* indicates that the Court of Appeals for the Third Circuit might be willing to accept some lesser quantum of conduct as sufficient to establish jurisdiction than that required to satisfy the "direct causation" standard. Most

notable is the court's statement in *Kasser* that the federal securities laws "do grant jurisdiction in transnational securities cases where *at least some activity designed to further a fraudulent scheme* occurs within this country." *Kasser*, 548 F.2d at 114 (emphasis added). We disagree with plaintiffs, however, to the extent they argue that this language indicates that *any* conduct within the United States will suffice.[10] To the contrary, language elsewhere in *Kasser* indicates that the level of domestic conduct, at the very least, must be significant and material to the fraud. *See, e.g., id.* at 115 n. 25, 116. "Merely preparatory" or insubstantial conduct is not enough. *See id.* at 115.

For purposes of this case, we do not need to decide the precise standard the Court of Appeals for the Third Circuit would apply in a close case because, as set forth below, the alleged United States conduct in this case is not substantial enough to confer jurisdiction under any reasonable interpretation of *Straub* or *Kasser*.

### b. *Jurisdiction in This Case*

Initially, we note that plaintiffs cannot rely on the mere fact that the court of appeals found jurisdiction in *Straub* and *Kasser* to support a finding of jurisdiction here. As stated above, the facts of *Straub* and *Kasser* differ widely from the facts presented in this case. In *Straub*, for example, "[t]he fraudulent scheme was conceived in the United States by American citizens, involved stock in an American

---

10. Plaintiffs, for example, suggest that the court's language in *Straub* that "[c]onduct within the United States is alone sufficient from a jurisdictional standpoint to apply the federal statutes," 540 F.2d at 595 (*quoted in Kasser*, 548 F.2d at 112–13), implies that any conduct, no matter how insignificant, would suffice to invoke federal jurisdiction. We disagree. To the contrary, the court's comment in *Straub* merely establishes that jurisdiction may be proper in cases where there is unlaw-

ful domestic *conduct* even if there is no *effect* on American interests. *See id.* (discussing whether nonresident foreign national plaintiffs may invoke the jurisdiction of the federal securities laws). The court specifically did not determine the *degree* of conduct required to establish such jurisdiction. *See id.* (indicating it was not necessary in that case to determine where the jurisdictional line should be drawn).

corporation traded on [an] American over-the-counter exchange, and an American securities broker from his office in New Jersey was responsible for the wrongful omissions." *Straub*, 540 F.2d at 595. None of these facts are present here. To the contrary, the alleged fraudulent scheme at issue here was conceived in the United Kingdom by British citizens, involves ordinary shares in a British corporation traded on a foreign exchange, and foreign citizens were responsible for the alleged wrongful misrepresentations and omissions. The policy grounds for the court's decision in *Straub*-the interest of the United States in regulating the conduct of its broker-dealers in this country and enhancing world confidence in its securities markets, *see id.*—likewise do not apply here. Rather, this case involves the conduct of foreign citizens and its impact on foreign securities markets.

Similarly, *Kasser* involved "significant" and "substantial" United States activities including: various negotiations within the United States; execution of a key investment contract at issue in the United States; incorporation of some of the defendant companies in the United States; and maintenance in the United States of records by American and foreign corporations that were crucial to the consummation of the fraud. *See Kasser*, 548 F.2d at 111, 115.

Also significantly, neither *Straub* nor *Kasser* was a class action lawsuit. Rather, both cases involved alleged fraudulent acts by defendants against a single or small group of individual victims. The court of appeals in *Bersch*, which was a class action, flagged what it called a "serious problem" regarding the foreign putative class members in that case—namely, "the dubious binding effect of a defendants' [sic] judgment (or a possibly inadequate plain-

tiff's judgment) on absent foreign plaintiffs or the propriety of purporting to bind those plaintiffs by a settlement." *See Bersch*, 519 F.2d at 986; *see also id.* at 996–97. As the *Bersch* court noted, such problems are not presented when the SEC seeks to enjoin activity (as in *Kasser*) or when the action is by named plaintiffs (as in *Straub*). *See Bersch*, 519 F.2d at 986 n. 26; *see also IIT*, 519 F.2d at 1018 n. 31 ("Class actions may stand differently, for reasons developed in *Bersch* primarily the likelihood that a very small tail may be wagging an elephant and that there is doubt that a judgment of an American court would protect the defendants elsewhere.").

Thus, the findings of jurisdiction in *Straub* and *Kasser* do not dictate the outcome in this case. The Court of Appeals for the Third Circuit has not addressed whether the principles applied in *Straub* and *Kasser* would support jurisdiction under the entirely different factual scenario presented here—class claims brought by foreign investors who purchased securities on a foreign exchange stemming from allegedly fraudulent misrepresentations made by foreign defendants primarily in a foreign country. We find that *Straub* and *Kasser* do not support a finding of jurisdiction in this case.

Here, the conduct underlying plaintiffs' cause of action primarily occurred in the United Kingdom. For example, all of the alleged fraudulent misrepresentations and omissions originated in England and were initially published in foreign press releases and newspapers. The only fraudulent conduct alleged to have taken place in the United States is the inclusion of some of the purported fraudulent misrepresentations and omissions in forms Marconi filed with the SEC and the dissemination of the statements published in the British press in the United States.[11] We find that these

---

11. With the exception of the SEC filings, plaintiffs do not allege that defendants them-

selves circulated any statements published in

alleged acts are insubstantial in comparison to the conduct that purportedly occurred in the United Kingdom and could not have played a significant role in furtherance of any fraud perpetrated against the foreign investors.

In short, the connection between the alleged United States conduct and the claims of the foreign investors in this case is too tenuous to support a finding of subject-matter jurisdiction over those claims under the securities laws. This is not a case involving defendants who have "unleash[ed] from this country a pervasive scheme to defraud" the foreign plaintiffs. *Kasser*, 548 F.2d at 114. Nor is this an instance where defendants used the United States as a base of operations for perpetrating fraud. *See id.* Rather, this is a case in which the alleged fraud was committed by foreign defendants on foreign individuals in a foreign country—a situation the federal securities laws were not intended to remedy. *See Butte Min. PLC v. Smith*, 76 F.3d 287, 291 (9th Cir.1996) ("We are not to be a haven for scoundrels; nor should we be a host for the world's victims of securities fraud.").

In their opposition brief and at oral argument, plaintiffs strongly argue that the allegedly fraudulent statements defendants made in the United Kingdom constitute "activity in the United States" because the misrepresentations and omissions concerned the status of Marconi's United States operations—the most substantial segment of Marconi's business. Plaintiffs argue that Tri–Star and other purchasers

of Marconi ordinary shares relied on the fact that a substantial amount of Marconi's sales and revenues were generated from its United States businesses and that defendants' failure to disclose serious problems in Marconi's United States businesses (e.g., outdated technology and failure to obtain necessary certifications) caused them to purchase their shares at a price they would not have otherwise paid.

Even assuming plaintiffs' allegations regarding the status of Marconi's United States operations are true, the argument that these operations support a finding of jurisdiction is flawed. Marconi's United States business operations were not themselves fraudulent. Rather, the fraud arises from the representations defendants did or did not make *about* those operations. Simply making fraudulent statements about what is happening in the United States does not make those statements "United States conduct" for purposes of the conduct test. Nor does it make the underlying activity itself fraudulent.[12]

Plaintiffs also rely on the "fraud-on-the-market" theory to support a finding of jurisdiction. Under the fraud-on-the-market theory, when materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed. *See, e.g., Basic Inc. v. Levinson*, 485 U.S. 224, 245–47, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). That is, an inves-

the British newspapers in the United States. Rather, they allege that the newspaper articles were available in the United States via the Internet and other such means.

12. In addition, the mere fact that Marconi carries on substantial business operations in the United States is not, in itself, sufficient to confer subject-matter jurisdiction under the securities laws. *See, e.g., In re Baan Co. Sec.*

*Litig.*, 103 F.Supp.2d 1, 10 n. 14 (D.D.C.2000) (stating that while the fact that defendant conducts a great deal of business in the United States "would be important to the issue of personal jurisdiction, [it is] irrelevant to subject matter jurisdiction. The conduct test requires that the fraudulent activity take place in the United States, and the fact that defendants conducted other activity in the United States is not significant.").

tor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. *See id.* Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, may be presumed for purposes of a Rule 10b–5 action. *See id.*

Plaintiffs argue that the alleged fraudulent misrepresentations and omissions contained in the forms Marconi filed with the SEC constitute significant activity in furtherance of the fraud against Marconi's ordinary shareholders because the market absorbed the information contained in those filings and the price of both Marconi ADRs and Marconi ordinary shares reflected that information. In support of this argument, plaintiffs point, *inter alia,* to the fact that Marconi ADRs on the NASDAQ market traded in tandem with Marconi ordinary shares on the London Stock Exchange. They argue that there was a "seamless, worldwide market" for Marconi securities and what Marconi said in either London or in the SEC filings affected the price of Marconi's ADRs and ordinary shares identically. Thus, according to plaintiffs, what Marconi said to the SEC in the United States was as signifi-

cant to the fraud as what it said in the press in London.

We disagree. Employing the "fraud-on-the-market" doctrine to satisfy the conduct test in this type of class action lawsuit involving overwhelmingly foreign transactions would extend the jurisdictional reach of the securities laws too far. Essentially, it would allow foreign purchasers of securities of a foreign corporation traded on a foreign exchange to sue the corporation and other foreign defendants in a United States court for fraudulent misrepresentations made abroad whenever the corporation also filed forms with the SEC containing identical misrepresentations and omissions. We do not believe that Congress intended such a result.[13]

The two cases plaintiffs cite in support of their arguments, *In re Int'l Nesmont Sec. Litig.,* Civ. No. 94–4202 (D.N.J. filed Dec. 2, 1996), and *In re Gaming Lottery Sec. Litig.,* 58 F.Supp.2d 62 (S.D.N.Y. 1999), do not persuade us otherwise. Plaintiffs in *Nesmont,* an unpublished decision of the District Court for the District of New Jersey, alleged that Nesmont, a Canadian corporation, Nesmont's accoun-

---

**13.** Defendants correctly point out that a number of other courts addressing this issue have held that SEC filings in and of themselves did not constitute domestic conduct sufficient to confer jurisdiction under the federal securities laws in class actions involving similar facts. *See, e.g., In re Baan Co. Sec. Litig.,* 103 F.Supp.2d 1, 10 (D.D.C.2000); *McNamara v. Bre–X Minerals Ltd.,* 32 F.Supp.2d 920, 924–25 (E.D.Tex.1999); *Nathan Gordon Trust v. Northgate Exploration Ltd.,* 148 F.R.D. 105, 108 (S.D.N.Y.1993); *Kaufman v. Campeau Corp.,* 744 F.Supp. 808, 810 (S.D.Ohio 1990). We note that these cases may be of limited value because they apply the arguably stricter formulation of the conduct test than that applied in this circuit. That issue aside, however, we believe the reasoning applied in some of those cases applies equally to the case at hand. For example, like the court in *Kauf-*

*man,* we find that the inclusion of alleged misrepresentations in reports filed with the SEC and in statements made to the foreign press and circulated in the United States are insubstantial in comparison to the conduct that allegedly occurred abroad and that this conduct could not have played a significant role in any losses sustained by the foreign investors. *See Kaufman,* 744 F.Supp. at 810 ("In short, the conduct alleged to have occurred within the United States has too tenuous a connection with the claims of the Canadian investors to support the exercise of jurisdiction over such claims."). The *Kaufman* court also recognized policy considerations similar to those addressed in *Kasser* and found that exercising subject matter jurisdiction over the foreign plaintiffs' claims would not serve those policies. *See id.* at 810–11.

tants, and other defendants made fraudulent misrepresentations and omissions in various press releases and reports, including forms filed with the SEC, that artificially inflated the price of Nesmont stock on both the Vancouver Stock Exchange and on the NASDAQ market. *See Nesmont,* Civ. No. 94–4202, slip op. at 2. The court denied defendants' motion to dismiss the claims made by non-United States residents who purchased Nesmont stock on the Vancouver Stock Exchange by holding that the United States activity in furtherance of the alleged fraud was sufficient to satisfy the conduct test. *See id.* at 3, 31–32.

Although the court relied in part on Nesmont's SEC filings in finding jurisdiction, *Nesmont* does not dictate a similar result in this case. First, *Nesmont* is an unpublished decision from another district court within this circuit and, thus, is not binding on this court. Second, and more importantly, the United States conduct in *Nesmont* involved more than just the SEC filings and was far more substantial than the conduct alleged in this case. Nesmont had a New York stock promoter that issued numerous press releases and other misleading information into the United States marketplace and financial press. *See id.* at 31. Nesmont also had significant contacts with the United States in connection with the preparation of an allegedly misleading audit. *See id.*

In *Gaming Lottery,* a securities fraud class action, plaintiffs moved to certify a class composed of all American and Canadian persons who purchased the common stock of Gaming Lottery Corporation ("GLC"), a Canadian company, in the American or Canadian securities markets. *See Gaming Lottery,* 58 F.Supp.2d at 64. Plaintiffs argued that GLC and two of its officers made materially false and misleading statements and omissions concerning an acquisition that artificially inflated the price of GLC stock. *See id.* GLC stock traded on the Toronto Stock Exchange and the NASDAQ market. *See id.* at 64–65. The District Court for the Southern District of New York granted plaintiffs' motion for class certification and denied defendants' motion to dismiss the Canadian plaintiffs' claims for lack of subject-matter jurisdiction, holding that defendants had "committed several acts within the United States which were more than merely preparatory and which allegedly directly caused the Canadian plaintiffs' losses." *Id.* at 73–74.

As in *Nesmont,* however, the United States conduct in *Gaming Lottery* involved much more than the filing of misleading financial reports. The *Gaming Lottery* plaintiffs' complaint revolved around GLC's acquisition of a corporation incorporated in Washington state and alleged, *inter alia,* that GLC was illegally operating this United States subsidiary in the United States and that it deliberately deceived the Washington State Gambling Commission in order to do so. *See id.* at 74. Defendants made announcements of increased earnings by incorporating the subsidiary during a time when it had not truly completed the acquisition and was operating the subsidiary without state regulatory approval. *See id.* For these reasons, *Nesmont* and *Gaming Lottery* are factually distinguishable from this case and do not support a finding of jurisdiction here.

Finally, contrary to plaintiffs' suggestion, exercising jurisdiction over the claims of the foreign investors in this case would not serve the policy interests embraced by the court of appeals in *Kasser.* First, to deny jurisdiction here will not "create a haven" for those who wish to defraud foreign securities investors. *See Kasser,* 548 F.2d at 116. As set forth above, the alleged United States conduct in this case is insignificant compared to the conduct

abroad and the overwhelmingly foreign nature of the claims at issue. Because defendants did not seek to use the United States as a base from which to defraud the foreign investors, denying jurisdiction here does not implicate the court of appeals' concern that the United States would become "a 'Barbary Coast,' ... harboring international securities 'pirates.'" *Id.* For similar reasons, the worry that "a holding of no jurisdiction might induce reciprocal responses on the part of other nations" likewise is not at issue here. Finally, since defendants' alleged fraudulent conduct emanated from the United Kingdom, exercising jurisdiction over the claims of the foreign ordinary shareholders in this case would do little to "insure high standards of conduct in securities transactions within this country." *Id.*

In sum, based upon on the facts alleged in this case, we agree with defendants that plaintiffs' attempt to bring this very large class of foreign investors in foreign securities before this court is not supported by the Exchange Act or the case law interpreting the Act. The plaintiffs at issue here are non-United States residents who purchased securities of a foreign corporation on a foreign exchange and are asserting claims based on the alleged fraudulent conduct of foreign citizens that took place almost exclusively in a foreign country. This simply is not the sort of conduct that the federal securities laws remedy under any reasonable interpretation of those laws. For these reasons, we will grant defendants' motion to dismiss the claims of Tri–Star and the putative class of non-resident purchasers of Marconi ordinary shares.

### B. *Failure to State a Claim*

Defendants also have moved for dismissal of the Complaint in its entirety for failure to state a claim upon which relief can be granted.

When the court considers a Rule 12(b)(6) motion to dismiss, the issue is not whether plaintiffs will prevail in the end or whether recovery appears to be unlikely or even remote. The issue is limited to whether, when viewed in the light most favorable to plaintiffs, and with all well-pleaded factual allegations taken as true, the complaint states any valid claim for relief. *See ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 859 (3d Cir.1994). In this regard, the court will not dismiss a claim merely because plaintiffs' factual allegations do not support the particular legal theory they advance. Rather, the court is under a duty to examine independently the complaint to determine if the factual allegations set forth could provide relief under any viable legal theory. 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 n. 40 (2d ed.1990); *see also Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Based on the pleadings of record, the arguments of counsel, and the briefs filed in support and opposition thereto, the court is not persuaded "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99. Therefore, defendants' motion to dismiss for failure to state a claim upon which relief can be granted will be denied.

### III. *CONCLUSION*

For these reasons, we find that the court lacks subject-matter jurisdiction in this case over the claims of Tri–Star and the putative class of non-resident purchasers of Marconi ordinary shares. Therefore, we will grant defendants' motion to dismiss these claims. Defendants' motion to

dismiss is denied in all other respects. The appropriate order follows.