ITOBA LIMITED, Plaintiff–Appellant,

v.

LEP GROUP PLC, William R. Berkley, John L. Read, Peter J. Grant, John R. East, Defendants–Appellees.

No. 582, Docket 94–7562.

United States Court of Appeals, Second Circuit.

Argued Dec. 1, 1994.

Decided May 15, 1995.

Mark C. Zauderer, New York City (James Robert Pigott, Jr., Stein, Zauderer, Ellenhorn, Frischer & Sharp, New York City, Richard F. Lawler, James C. Riley, Whitman Breed Abbott & Morgan, Greenwich, CT, of counsel), for plaintiff-appellant.

Jeffrey E. Glen, New York City (Berwin Leighton, New York City, Mark B. Seiger, Halloran & Sage, Hartford, CT, of counsel), for defendant-appellee LEP Group PLC.

William McGuinness, New York City (Fried, Frank, Harris, Shriver & Jacobson, New York City, of counsel), for defendants-appellees William R. Berkley and Peter J. Grant.

Alan H. McLean, Stamford, CT (Neville, Shaver, Kelly & McLean, Stamford, CT, of counsel), for defendant-appellee John R. East.

John L. Read, pro se.

Before: FEINBERG, VAN GRAAFEILAND and MINER, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Itoba Limited appeals from a judgment of the United States District Court for the District of Connecticut (Eginton, J.) dismissing its securities fraud action against Lep Group PLC, William Berkley, John Read, Peter Grant and John East for lack of subject matter jurisdiction. For the reasons stated below, we reverse and remand for further proceedings.

The corporate defendant in this case, Lep Group PLC, is a London-based holding company with some fifty subsidiaries operating in thirty countries. It is a true conglomerate, owning businesses in freight forwarding, home security systems, biotechnology, travel services, and real estate speculation. Lep's "ordinary shares", the British equivalent of common stock, are registered in the United Kingdom, obligating the company to comply with United Kingdom securities laws. The primary trading market for Lep's ordinary shares is the International Stock Exchange of the United Kingdom and the Republic of Ireland Ltd. (the "London Exchange").

To create a United States market for its ordinary shares, Lep deposited 12,842,850 of its approximately 136 million shares in an American depository in 1988. The depository in turn issued an American Depository Receipt (ADR) for each five ordinary shares of Lep on deposit. Because these ADRs trade in the form of American Depository Shares (ADSs) on the National Association of Securities Dealers Automated Quotation System ("NASDAQ"), Lep is subject to the reporting and disclosure requirements of United States securities law.

A.D.T. Limited ("ADT") is a transnational holding company based in Bermuda. Its shares are listed on the New York Stock Exchange and approximately fifty percent of its shareholders of record reside in the United States. Itoba, a Channel Islands company, is a wholly-owned subsidiary of ADT. ADT also is the corporate parent of A.D.T. Securities Systems, Inc., a Delaware-based firm and one of America's largest suppliers of security and protection services.

In mulling over expansion plans for A.D.T. Securities Systems, ADT considered the possible acquisition of one of A.D.T. Securities Systems' largest competitors in the American security market, National Guardian, ADT already owned a small interest in that corporation through shares it held of Lep, the parent company of National Guardian. Because ownership of Lep would lead to control of National Guardian, ADT considered increasing its Lep holdings.

At the same time, Canadian Pacific was interested in expanding into the freight forwarding business and also was pondering a sizeable investment in Lep. Learning of

their mutual interest, the companies agreed to explore a joint purchase of Lep. Canadian Pacific hired S.G. Warburg, a London investment bank, to evaluate Lep's business operations. Nicholas Wells, ADT's in-house financial analyst, was directed by Michael Ashcroft, ADT's chairman, to perform a valuation of Lep.

In December 1989, S.G. Warburg issued an extensive report assessing Lep's prospects. The analysis in this report was based on Lep's U.K. annual reports, the Form 20–F that Lep filed with the United States Securities and Exchange Commission for the year ended December 31, 1988, Lep's shareholder register, and broker reports. Shortly after the Warburg report was issued, Canadian Pacific abandoned the proposed joint venture.

ADT's interest, on the other hand, did not diminish. Wells continued his examination of Lep, relying heavily on the Warburg report. To supplement his research, he obtained from Canadian Pacific a copy of Lep's Form 20–F for 1988. Wells frequently discussed his analyses of these documents with David Hammond, ADT's vice chairman and the person in charge of acquisitions.

Based on Wells' analyses and their own review of the Warburg report, Hammond and Ashcroft decided to acquire Lep. Soon thereafter, Hammond formulated a plan to increase ADT's Lep holdings by making anonymous purchases on the market through one of ADT's offshore companies, in this case Itoba. Hammond contacted the board members of Itoba and recommended that they approve his purchase plan.

As expected, Itoba's board approved the plan. Itoba's board then requested one of ADT's employees to commence share purchases in Itoba's name; these purchases were made according to Hammond's plan and paid for by ADT. During the second half of 1990, Itoba executed a number of significant purchases on the London Exchange pursuant to the plan. By November 1990, Itoba had acquired over 37 million Lep ordinary shares for approximately $114 million.

Before ADT could complete its planned acquisition, however, Lep disclosed a series of business reversals that decimated its share value; Lep's stock price plummeted 97% and the value of Itoba's Lep holdings declined by nearly $111 million. Lep wrote off approximately $522 million from its books for the fiscal year ended December 31, 1991.

Itoba sued Lep and its officers in the District of Connecticut, asserting violations of sections 10(b) and 20 of the Securities Exchange Act of 1934 (the "Act") and of Rule 10b–5. According to Itoba, the defendants were subject to liability because they failed to disclose material matters in statements filed with the SEC. Specifically, Itoba alleged that Lep made high risk investments and engaged in speculative business ventures without informing the investing public. Itoba claimed that had these matters been properly disclosed, it would not have purchased Lep's stock at artificially inflated prices.

Itoba also asserted claims against Lep director William Berkley for alleged violations of sections 10(b) and 12(2) of the Act and of Rule 10b–5. Berkley, a United States citizen and a resident of Connecticut, had sold a large block of Lep ordinary shares in the United States on the same day that Itoba purchased a large block of shares in London. Itoba alleged that had Berkley properly complied with his duty to disclose material, non-public information before trading, it would not have made that purchase.

Defendants moved to dismiss Itoba's claims for lack of subject matter jurisdiction, and Magistrate Judge Jean Margolis, to whom the matter was referred for recommendation and report, issued a report that recommended dismissing Itoba's action on jurisdictional grounds. The district court adopted the magistrate judge's recommendations in toto. It dismissed Itoba's action on Fed.R.Civ.P. 12(b)(1) grounds in a short-form order. This, we conclude, was error.

■ It is well recognized that the Securities Exchange Act is silent as to its extraterritorial application. *See, e.g., Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir.) (citing 15 U.S.C. § 78aa), *cert. denied*, 502 U.S. 1005, 112 S.Ct. 638, 116 L.Ed.2d 656 (1991). However, in determining whether Congress intended that the "precious resources of United States courts" be devoted to a specific transnational securities fraud claim, we are not without guidance. Two jurisdictional tests have emerged under this Court's deci-

sions: the "conduct test", as announced in *Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326, 1336–37 (2d Cir. 1972), and the "effects test", as announced in *Schoenbaum v. Firstbrook,* 405 F.2d 200, 206–09 (2d Cir.), *rev'd with respect to holding on merits,* 405 F.2d 215 (2d Cir.1968) (in banc), *cert. denied sub nom. Manley v. Schoenbaum,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). There is no requirement that these two tests be applied separately and distinctly from each other. Indeed, an admixture or combination of the two often gives a better picture of whether there is sufficient United States involvement to justify the exercise of jurisdiction by an American court. It is in this manner that we address the issue of jurisdiction in the instant case. Because we believe that the allegations are sufficient to support jurisdiction, we reverse.

■ Under the conduct test, a federal court has subject matter jurisdiction if (1) the defendant's activities in the United States were more than "merely preparatory" to a securities fraud conducted elsewhere, *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 987 (2d Cir.), *cert. denied,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975), and (2) these activities or culpable failures to act within the United States "directly caused" the claimed losses, *Alfadda, supra,* 935 F.2d at 478. Inherent in the conduct test is the principle that Congress does not want " 'the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners.' " *Psimenos v. E.F. Hutton & Co.,* 722 F.2d 1041, 1045 (2d Cir.1983) (quoting *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1017 (2d Cir. 1975)).

The magistrate judge correctly stated the conduct test when she said that Itoba must prove that Lep's United States-based activities directly caused Itoba's financial losses. However, whether she correctly applied the test is an entirely different matter. The magistrate judge based her recommendation to deny jurisdiction on the following findings:

First, Itoba and ADT did not read the SEC filing and rely on them; it was an investment bank hired by ADT which had reviewed the documents. And second, the SEC filings were filed in connection with

LEP's ADS's and ADR's, not the ordinary shares purchased by Itoba, for which annual reports and press releases were generated from England.

■ The magistrate judge's first finding— that ADT and Itoba did not read and rely on the SEC filing in making their purchase decision—must be rejected in view of the clearly-established fact that the executives of Itoba and ADT based their investment decision on the Warburg report. The analyses and conclusions in this report were predicated on information found in the Form 20–F that Lep filed with the SEC. Nicholas Wells, the ADT executive responsible for assessing investment prospects, made the Warburg report the centerpiece of his Lep valuation. Moreover, he not only relied on the discussion of the SEC filing as contained in the Warburg report, he also used his own copy of the 1988 Form 20–F to formulate his purchase recommendations. According to the affidavit of ADT's vice chairman, the decision to acquire Lep was based upon these recommendations.

The fact that Itoba's board members did not read the SEC filing is not of controlling significance. A party need not personally have read a misleading financial report to establish reliance; derivative reliance is a well-established basis for liability in a Rule 10b–5 action. *See, e.g., Austin v. Loftsgaarden,* 675 F.2d 168, 177–78 & n. 19 (8th Cir. 1982), *appeal after remand,* 768 F.2d 949 (8th Cir.1985), *rev'd on other grounds sub nom. Randall v. Loftsgaarden,* 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986); *Garfinkel v. Memory Metals, Inc.,* 695 F.Supp. 1397, 1404 (D.Conn.1988); *Kronfeld v. Trans World Airlines, Inc.,* 104 F.R.D. 50, 53–54 (S.D.N.Y.1984); *Walsh v. Butcher & Sherrerd,* 452 F.Supp. 80, 84 (E.D.Pa.1978); *In re Ramada Inns Sec. Litig.,* 550 F.Supp. 1127, 1131 (D.Del.1982). The acquisition plan that Itoba's directors approved was formulated and funded by ADT, which in turn relied on its financial officer's analysis of the Warburg report and Lep's SEC filing. The contents of Lep's 1988 Form 20–F were thus a "substantial" and "significant contributing cause" to Itoba's purchase decision. There is no requirement, as suggested by the magistrate judge's decision, that Itoba read Lep's filing before it could rely on it.

■ The magistrate judge's second reason for denying jurisdiction, i.e., that the SEC filings were made in connection with Lep's ADSs and ADRs, not its ordinary shares, is only fifty percent correct and therefore is one hundred percent wrong. The ADRs were simply a grouping into one security of five ordinary shares. Inevitably, there was a direct linkage between the prices of the ADRs representing five ordinary shares and the prices of the single ordinary shares themselves. If the ordinary share price fell on the London Exchange, the market price of an ADR would decrease in similar manner, and visa versa.

Finally, a Rule 10b–5 action is not barred because a false and misleading statement in an SEC filing pertains to a security that is not the security purchased. *See In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953, 961–62 (2d Cir.1993). So long as the fraudulent device employed is of the type that would cause reasonable investors to rely thereon and, so relying, cause them to purchase or sell the corporation's securities, a Rule 10b–5 action may lie. *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860 (2d Cir.1968) (in banc), *cert. denied sub nom. Coates v. Securities & Exchange Comm'n*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). SEC filings generally are the type of "devices" that a reasonable investor would rely on in purchasing securities of the filing corporation. When these United States filings include substantial misrepresentations, they may be a predicate for subject matter jurisdiction. *See Psimenos, supra,* 722 F.2d at 1045 (citing *Leasco, supra,* 468 F.2d at 1337).

The fact that the Lep ordinary shares were issued and purchased in England does not change our conclusion. "The conduct test does not center its inquiry on whether domestic investors or markets are affected, but on the nature of conduct within the United States as it relates to carrying out the alleged fraudulent scheme...." *Psimenos, supra,* 722 F.2d at 1045; *see Leasco, supra,* 468 F.2d at 1337.

Moreover, the making of the allegedly false and misleading filings with the SEC was not "merely preparatory to the fraud."

Although the magistrate judge refrained from forthrightly stating as much, she tiptoed around that statement as follows:

> It is beyond dispute that SEC filings and press releases are the type of information on which an investor relies in making his or her investment decisions. *Securities & Exchange Comm'n v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir.1968), *cert. denied sub nom. Coates v. Securities & Exchange Comm'n,* 394 U.S. 976[, 89 S.Ct. 1454, 22 L.Ed.2d 756] (1969). Even beyond the issue of whether the SEC filings were "merely preparatory to the fraud," plaintiff cannot demonstrate that the alleged acts within the United States "directly caused [its] losses" for two reasons.

She then propounded the two reasons we have rejected in the preceding paragraphs and cited two cases whose application here is questionable at best, *Koal Industries Corp. v. Asland, S.A.*, 808 F.Supp. 1143, 1153–55 (S.D.N.Y.1992) and *Nathan Gordon Trust v. Northgate Exploration, Ltd.*, 148 F.R.D. 105, 107–08 (S.D.N.Y.1993). In *Koal Industries,* a Panamanian corporation acquired two Netherlands Antilles corporations which owned interests in an Arkansas mining company. The entire transaction took place in Switzerland and the financing was obtained from outside the United States. The only contact with the United States other than the location of the mine was a telephone call seeking additional funds for the acquisition. *Northgate* involved a motion for class certification. The defendant was a Canadian corporation which owned an interest in a gold mine located in northern Canada, concerning which the defendant filed allegedly false SEC statements. The proposed class was to consist of all persons who purchased Northgate stock on the Toronto, Montreal, London and New York Exchanges. The defendant requested that the class be limited to those who purchased on the New York Exchange, and the district court granted its request. In contrast to the discretionary nature of the district court's class certification ruling and the "fraud on the market" class issues of *Northgate,* the instant case involves a single plaintiff asserting direct individual fraud.

■ Appellees address the issue of "preparatory conduct" more directly. They assert that the mere filing of a document with the SEC should not trigger jurisdiction in United States courts. In support of this contention, they point out that Lep's financial statements were prepared in England and contend that the act of filing alone should not confer subject matter jurisdiction in the United States. They say further that the filing was "incidental or preparatory conduct" in whatever wrongdoing may have occurred. With respect to the first contention, we hold that the situs of preparations for SEC filings should not be determinative of jurisdictional questions. Otherwise, the protection afforded by the Securities Exchange Act could be circumvented simply by preparing SEC filings outside the United States. We find no support in the Act for such a result.

The second half of appellees' argument overlooks a basic purpose of the securities law, which is fair disclosure of material facts. A material fact that is undisclosed in an SEC filing remains undisclosed absent public enlightenment. This may bring into play a concomitant duty, i.e., the duty to correct. *See* 2 Bromberg & Lowenfels, *Securities Fraud & Commodities Fraud* § 6.11, at 138.401–.509 (2d ed. 1994). Lep's uncorrected nondisclosure played as much a role in Itoba's purchases as the price listings on the London Exchange and NASDAQ. In view of the deleterious effect this continued nondisclosure had on the thousands of ADT shareholders in the United States, it cannot be described correctly as incidental or preparatory.

■ This argument, of course, combines pertinent principles of both the conduct and effects tests, the latter one being based on fraud which takes place abroad which impacts on "stock registered and listed on [an American] national securities exchange and [is] detrimental to the interests of American investors." *Schoenbaum, supra,* 405 F.2d at 208. Here, we have fraud occurring on an American exchange and persisting abroad that has impacted detrimentally upon thousands of United States shareholders in the defrauded company, i.e., over $100 million lost in the shareholders' corporate equity.

■ The magistrate judge held that "if ADT were the plaintiff, the 'effects test' would be met, in that ADT's stock is traded on the New York Stock Exchange and approximately fifty percent (50%) of its shares are held in this country." *See generally Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 262–63 (2d Cir.), *amended on other grounds,* 890 F.2d 569 (2d Cir.), *cert. dismissed,* 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639 (1989); *Matter of Marc Rich & Co. A.G.,* 707 F.2d 663, 666–67 (2d Cir.), *cert. denied,* 463 U.S. 1215, 103 S.Ct. 3555, 77 L.Ed.2d 1400 (1983); *United States v. Aluminum Co. of Am.,* 148 F.2d 416, 443 (2d Cir.1945); *Restatement (Second) of Law of Foreign Relations* § 18(b), cmt. d. We believe this reasoning applies with equal effect where, although Itoba, ADT's wholly-owned subsidiary, was the nominal purchaser and owner of the Lep stock, it was ADT which financed the deal and which, with its shareholders, ultimately must bear the loss. This is not a case in which Lep's acts "simply [had] an adverse affect [sic] on the American economy or American investors generally." *See Bersch, supra,* 519 F.2d at 989. In short, we hold that a sufficient combination of ingredients of the conduct and effects tests is present in the instant case to justify the exercise of jurisdiction by the district court. *See generally Leasco, supra,* 468 F.2d at 1338.

■ For some reason that is not clear to us, the magistrate judge did not consider it necessary to address specifically Itoba's causes of action against any of the individual defendants. She simply recommended a blanket dismissal of the complaint as to all defendants, which recommendation was adopted without discussion by the district court. We find this particularly troublesome with respect to the defendant Berkley.

On October 8, 1990, Berkley, a United States resident and a Lep director, sold 7,300,000 ordinary shares of Lep to his United States-based broker, New York & Foreign Securities Corporation, which in turn sold these shares for its own account on the London Exchange. Berkley received almost $24 million for his shares. That same day,

Itoba purchased 7,500,000 shares on the London Exchange through its London-based broker. Whether the close temporal relationship of these two transactions is or is not coincidental presents an interesting question. After executing this purchase, Itoba and ADT executives learned that the shares they had acquired were owned previously by Berkley. When Itoba brought the instant action, it asserted a separate claim against Berkley based on this Court's "disclose or abstain" rule, which imposes on insiders a duty to disclose material information before trading in their company's securities. *See SEC v. Texas Gulf Sulphur Co., supra*, 401 F.2d at 848. In *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 237 (2d Cir.1974), we held that an insider who fails to comply with his duty to disclose or abstain can be held liable "not only to the purchasers of the actual shares sold by [the insider,] but to all persons who during the same period purchased [the corporation's] stock in the open market without knowledge of the material inside information which was in the possession of [the insider]."

Although we do not presently rule on the issue, it would seem that Berkley's failure to disclose material, nonpublic information prior to selling his Lep shares is the type of behavior that falls under this Rule 10b–5 rubric. Because antifraud provisions are designed to prevent corporate insiders from taking unfair advantage of uninformed outsiders, *Shapiro v. Merrill Lynch, supra*, 495 F.2d at 235 (citing *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 890 (2d Cir.1972)), Berkley's alleged nondisclosure during a sales transaction executed by two parties within the United States—Berkley and his broker—is the type of conduct that should trigger jurisdiction. *See Roth v. Fund of Funds, Ltd.*, 279 F.Supp. 935, 936–37 (S.D.N.Y.), *aff'd*, 405 F.2d 421 (2d Cir.1968), *cert. denied*, 394 U.S. 975, 89 S.Ct. 1469, 22 L.Ed.2d 754 (1969).

Moreover, it is not clear that Itoba is disabled from asserting its claim because it purchased its shares on a foreign market—the London Exchange. In *Shapiro v. Merrill Lynch, supra*, we held that an inside trader is subject to liability to all purchasers of his corporation's stock on the "open market." 495 F.2d at 237. Whether the "open market" encompasses foreign exchanges is an issue we leave for remand.

We conclude that Itoba's claim against Berkley should not have been incorporated without discussion into Itoba's claim against the non-resident defendants and just as silently dismissed.

## CONCLUSION

Unlike some securities actions brought to recover questionable damages on behalf of optimistically described classes, we are met here with a single plaintiff which suffered direct substantial losses. A plaintiff such as this should not be deprived of its day in an American court by a Rule 12(b)(1) order based on erroneous facts and questionable law. We conclude that the issues now before us best can be resolved by a trial on the merits in which the facts relevant to jurisdiction may be more fully developed. *See Bersch, supra*, 519 F.2d at 992–93 (quoting *Leasco, supra*, 468 F.2d at 1330). We reverse the judgment below and remand for such a trial.