In re: BAYER AG SECURITIES LITIGATION

No. 03 Civ.1546 (WHP).

United States District Court, S.D. New York.

Sept. 14, 2005.

Melvyn I. Weiss, Michael C. Spencer, Milberg Weiss Bershad & Schulman LLP, New York, NY, for Plaintiffs.

Roger J. Hawke, Andrew W. Stern, Daniel A. McLaughlin, Walter C. Carlson, James W. Ducayet, Sidley Austin Brown & Wood LLP, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

This securities fraud class action concerns alleged misrepresentations and omissions about the safety and commercial viability of Baycol, a cholesterol-lowering drug known generically as cerivastatin. Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, against Bayer AG, Bayer Corporation ("Bayer Corp."), Wolfgang Plischke ("Plischke") and David Ebsworth ("Ebsworth") (collectively, "Defendants"). Plaintiffs also assert control person claims against the individual defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By Memorandum and Order, dated September 30, 2004, this Court dismissed the claims of foreign pur-

chasers of Bayer AG shares on foreign exchanges (the "Foreign Purchasers") for lack of subject matter jurisdiction and granted leave to replead. *In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546(WHP), 2004 WL 2190357, at *17–18 (S.D.N.Y. Sept.30, 2004) (*"Bayer I"*).

Availing themselves of that opportunity, Plaintiffs filed their Second Consolidated Amended Complaint on January 24, 2005 ("Complaint"), which included a new series of allegations titled "Subject Matter Jurisdiction over Foreign Purchasers on Foreign Exchanges." (Complaint, filed Jan. 24, 2005 ("Compl.") ¶¶ 19–24.) Defendants now move to dismiss the repleaded Foreign Purchasers' claims pursuant to Rule 12(b)(1). For the following reasons, Defendants' motion is granted.

## BACKGROUND

### I. *The Parties*

Plaintiffs in this action seek to represent a putative class "of all persons who purchased securities of Bayer AG between August 4, 2000 and February 21, 2003, inclusive (the 'Class Period') and have been damaged thereby, to recover damages caused by defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934." (Compl.¶ 1.) The factual allegations are described in detail in *Bayer I* and repeated here only as necessary to facilitate the inquiry into subject matter jurisdiction over the Foreign Purchasers.

Bayer AG is an international healthcare and chemical corporation organized and headquartered in Germany. (Compl. ¶ 27; Affidavit of Roger J. Hawke, dated Feb. 14, 2005 ("Hawke Aff.") Ex. A: Excerpts of Amendment No. 2 to Bayer AG's Form 20–F, dated Jan. 15, 2002.) Bayer AG's shares trade on the Frankfurt, Berlin, Bremen, Dusseldorf, Hamburg, Hannover,

Stuttgart and Munich stock exchanges. (Compl. ¶ 174 n.5.) Bayer AG is also listed on several other European exchanges and the Tokyo Stock Exchange. (Compl. ¶ 159 n.4; Hawke Aff. Ex. A at 144.) In the United States, Bayer AG began trading on the New York Stock Exchange in December 2001 in the form of American Depositary Shares evidenced by American Depositary Receipts. (Hawke Aff. Ex. A at 144.) During the Class Period, Plaintiffs allege, "Bayer AG manufactured, marketed, distributed, tested, promoted and sold Baycol ... in worldwide markets, prior to withdrawing the product." (Compl.¶ 27.)

Bayer Corp. is an Indiana corporation with its principal place of business in Pittsburgh, Pennsylvania. (Compl.¶ 28.) It is a wholly owned subsidiary of Bayer AG. (Compl.¶ 28.) Plaintiffs allege that during the Class Period, "Bayer Corp. manufactured, marketed, distributed, tested, promoted and sold Baycol for and in North American markets prior to the withdrawal of Baycol." (Compl.¶ 28.)

During the relevant period, the individual defendants were executive officers of Bayer AG and/or Bayer Corp. From 1995 through December 1999, Ebsworth was President of Bayer Corp.'s Pharmaceutical Division; thereafter, he headed Bayer AG's Pharmaceutical Business Group. (Compl.¶ 29.) When Ebsworth resigned on January 9, 2002, Plischke assumed leadership of the Pharmaceutical Business Group. (Compl.¶¶ 29–30.) Previously, Plischke had been Executive Vice President and President of Bayer Corp.'s Pharmaceutical Division. (Compl.¶ 30.)

### II. *Development and Marketing of Baycol*

In 1997, the Food and Drug Administration (the "FDA") approved the development and marketing of Baycol. (Compl.¶ 37.) Baycol was officially

launched in the United States in February 1998. (Compl.¶ 40.) In a May 1998 stockholders' newsletter, Bayer AG reprinted a speech given by Manfred Schneider, Chairman of its Board of Management, at its annual stockholders' meeting. The address provided that Bayer AG expected growth for the coming year to be driven by the company's healthcare sector and the "top-selling drugs and new medications such as the cholesterol-lowering drug Lipobay/Baycol." (Compl.¶ 43.)

In May 1998, a Bayer Corp. post-marketing report revealed that four patients taking Baycol developed rhabdomyolysis. (Compl. ¶ 44.) A later *Journal of the American Medical Association* article suggested that the incidence of rhabdomyolysis in patients taking Baycol indicated a possible "drug-drug interaction" with the drug gemfibrozil. (Compl.¶¶ 44–45.) In January 1999, the FDA required changes in Baycol labeling to reflect the reported events of rhabdomyolysis.

In 1999, Bayer AG issued its 1998 Annual Report noting that although Baycol had not met the company's expectations, its anticipated release of a higher dose should yield greater success. (Compl.¶ 52.) At the next annual stockholders' meeting, the Chairman of Bayer AG discussed the "blockbuster" potential of Baycol, which was later reprinted in a stockholders' newsletter. (Compl.¶ 55.) The FDA approved the higher dose of Baycol in May 1999 and a marketing campaign ensued. (Compl.¶ 59.)

Plaintiffs allege that although Defendants knew during this time that the higher dose of Baycol could present an increased risk of rhabdomyolysis, they failed to disclose it. (Compl.¶¶ 56–59.) By October 1999, the number of rhabdomyolysis cases related to Baycol had risen in the United States and abroad. (Compl.¶ 65.) In late October, the FDA advised Bayer Corp. that the current Baycol promotional materials were "false, lacking fair balance, or otherwise misleading" and must no longer be disseminated. (Compl.¶ 66.) In December 1999, Bayer Corp. revised the Baycol label to include a warning that Baycol should not be prescribed with gemfibrozil. (Compl.¶ 69.) Nonetheless, throughout this period Bayer AG continued to market Baycol aggressively in its press releases. (Compl.¶¶ 67–68.)

In early 2000, Bayer AG continued to report expectations of increased future growth and profitability based on the strong sales of Baycol. These disclosures were issued in Bayer AG's 1999 Annual Report in March 2000 and a companion press release. (Compl.¶¶ 81–82.) The company then endeavored to attain FDA approval for a higher dose of Baycol. (Compl.¶ 84.)

In April 2000, Ebsworth, head of Bayer AG's worldwide Pharmaceutical Business Group, held a meeting in New York City with senior managers to discuss his FDA approval strategy and marketing plans. At that meeting, the managers were advised that "there was no problem" with the higher dose of Baycol. (Compl.¶ 84.) Thereafter, Bayer AG issued a stockholders' newsletter reporting on the 2000 annual stockholders' meeting, including Chairman Schneider's remarks projecting further Baycol-driven growth. (Compl.¶¶ 85–86.) After the FDA approved the higher dose of Baycol in July 2000, Bayer AG issued a press release heralding that approval. (Compl.¶¶ 88–89.) Throughout this period, Bayer Corp. was aware that the incidence of rhabdomyolysis in patients taking Baycol was between 5 and 67 times higher than in those taking other statins. (Compl.¶¶ 77–80.)

### III.  *Market Withdrawal of Baycol*

By August 2000, Bayer AG's Japanese subsidiary advised the company that it

would discontinue its Baycol high dosage study due to a patient's symptoms of rhabodomyolysis. (Compl.¶¶ 94–95.) A few months later, the German health ministry placed Baycol on its watch list and by late October, 482 cases of Baycol-related rhabdomyolysis were reported worldwide. (Compl.¶ 98.) Nevertheless, in October 2000, a *Pharmaceutical Executive* article reported statements by Plischke, Executive Vice President of Bayer Corp., projecting strong sales of Baycol. Specifically, Plischke stated "Baycol will make close to $300 million in sales this year.... We talk about a potential $1 billion product in the United States, and we are still not being naive or overly ambitious." (Compl.¶ 96.) One month later, Bayer AG issued a press release announcing strong performance based on growth in Baycol sales. (Compl.¶ 103.) These statements failed to disclose any safety risks associated with Baycol.

In April 2001, with the number and severity of unfavorable Baycol reports increasing, the FDA mandated that the company address the risk of combining Baycol with gemfibrozil in stronger warning labels. (Compl.¶ 111.) Bayer Corp. complied with the FDA's narrow directive regarding gemfibrozil but did not disclose the risk of rhabdomyolysis with the higher dose of Baycol alone. (Compl. ¶ 111.)

Thereafter, the FDA became aware of the increased risk of fatal rhabdomyolysis associated with Baycol and "placed overwhelming pressure" on the company to withdraw the drug from the market. (Compl.¶ 117.) On August 8, 2001, Bayer AG issued a press release announcing the withdrawal of Baycol from all markets worldwide, except Japan. (Compl.¶ 118.) In that press release Bayer AG stated, "earnings for the full year will fall substantially short of previous estimates." (Compl.¶ 118.) Bayer Corp. issued a press release "virtually identical to Bayer AG's press release." (Compl.¶ 118.) Immediately following these announcements, the price of Bayer AG securities fell by approximately seventeen percent. (Compl.¶ 121.) That same day, Werner Wenning, the Chief Financial Officer of Bayer AG, stated that the company did not expect "claims for compensation from the [United States]." (Compl.¶ 120.)

## IV. *Events Following Baycol Withdrawal*

After the Baycol withdrawal, Bayer AG maintained in press releases that it acted responsibly when concerns regarding Baycol's safety arose and that it would vigorously defend unfounded claims asserted by United States litigants. (Compl.¶¶ 126–27.) Consistently, Bayer AG's Chairman stated to reporters that "Bayer insists the claims are 'groundless' and that it worked closely with regulators on both sides of the Atlantic." (Compl.¶ 129.) In November 2001, Bayer AG's stockholders' newsletter reported a 47.5 percent decline in net income. (Compl.¶ 137.) Later that year, on December 20, 2001, Bayer AG filed a Form 20–F Registration Statement with the Securities and Exchange Commission ("SEC") to offer its securities for sale in the United States. (Compl.¶ 138.) In its Registration Statement, Bayer AG disclosed the circumstances surrounding the withdrawal of Baycol and the details of resultant litigation in the United States. (Compl.¶ 138.) Bayer AG further disclosed, "[i]f the plaintiffs in these actions were to be successful, it is possible that the ultimate liability could be material to our results of operations and cash flows. We believe that we have meritorious defenses in these actions, and intend to defend them vigorously." (Compl.¶ 138.) In its 2001 Annual Report and later stockholders' newsletter in the spring of 2002, Bayer AG maintained its position that it

acted responsibly upon learning the safety risks of Baycol. (Compl.¶¶ 142, 144.) On June 24, 2002, Bayer AG filed its 2001 Annual Report with the SEC. (Compl.¶ 146.)

On February 22, 2003, *The New York Times* published an article titled "Papers Indicate That Bayer Knew of Dangers of Its Cholesterol Drug." (Compl.¶ 151.) The article revealed that "senior executives at Bayer were aware that their anticholesterol drug had serious problems long before the company pulled it from the market." (Compl.¶ 151.) The exposè further explained that the Baycol litigation unearthed internal decisions to market Baycol despite knowledge of the safety risks. (Compl.¶ 151.) The next trading day, the price of Bayer AG securities fell by approximately ten percent. (Compl.¶ 152.)

## DISCUSSION

Defendants move to dismiss the claims of the Foreign Purchasers for lack of subject matter jurisdiction. Defendants do not dispute subject matter jurisdiction over the claims of United States purchasers of Bayer AG securities.

### I. *Rule 12(b)(1) Motion to Dismiss Standard*

On a motion to dismiss pursuant to Rule 12(b)(1), this Court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Raila v. United States*, 355 F.3d 118, 119 (2d Cir.2004); *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir.2000). Dismissal is appropriate only where a plaintiff can prove no set of facts entitling him to relief. *Raila*, 355 F.3d at 119; *Sweet*, 235 F.3d at 83. "In resolving the question of jurisdiction, the district court can refer to evidence outside the pleadings and the plaintiff asserting subject matter jurisdiction has the burden of proving by a preponder-

ance of the evidence that it exists." *Luckett v. Bure*, 290 F.3d 493, 496–97 (2d Cir. 2002); *see also Phifer v. City of New York*, 289 F.3d 49, 55 (2d Cir.2002); *Lituma v. United States*, No. 04 Civ. 8955(NRB), 2005 WL 1705088, at *1 (S.D.N.Y. July 18, 2005); *Locksley v. United States*, No. 05 Civ. 2593(JGK), 2005 WL 1459101, at *1 (S.D.N.Y. June 15, 2005).

### II. *Subject Matter Jurisdiction Over Foreign Purchasers*

■ As this Court explained in *Bayer I*, subject matter jurisdiction over securities fraud claims involving largely foreign transactions exists only where a sufficient connection to the United States is present. 2004 WL 2190357, at *17. "When, as here, a court is confronted with transactions that on any view are predominantly foreign, it must seek to determine whether Congress would have wished the precious resources of the United States courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign countries." *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 985 (2d Cir.1975); *see also SEC v. Berger*, 322 F.3d 187, 192 (2d Cir.2003). Further, the Second Circuit has cautioned that class actions may raise considerations not present in SEC or individual actions to the extent "a very small tail may be wagging an elephant and that there is doubt that a judgment of an American court would protect the defendants elsewhere." *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1017–18 n. 31 (2d Cir.1975); *see also Berger*, 322 F.3d at 195–96; *Bersch*, 519 F.2d at 986–90, 993–98.

■ Courts in this circuit consider two factors in evaluating whether subject matter jurisdiction extends to foreign claims: "(1) whether the wrongful conduct occurred in the United States, and (2) whether the wrongful conduct had a substantial effect in the United States or upon United

States citizens." *Berger,* 322 F.3d at 192; *see also Europe & Overseas Commod. Traders, S.A. v. Banque Paribas London,* 147 F.3d 118, 128 (2d Cir.1998); *Psimenos v. E.F. Hutton & Co.,* 722 F.2d 1041, 1045 (2d Cir.1983). These respective inquiries are commonly known as the "conduct test" and the "effects test." *Itoba Ltd. v. LEP Group PLC,* 54 F.3d 118, 121–22 (2d Cir. 1995); *Nikko Asset Mgmt. Co. v. UBS AG,* 303 F.Supp.2d 456, 464 (S.D.N.Y.2004).

### A. *Conduct Test*

■ Subject matter jurisdiction lies under the conduct test "only when substantial acts in furtherance of the fraud were committed in the United States." *Psimenos,* 722 F.2d at 1045; *see also Berger,* 322 F.3d at 193. This threshold is met if "(1) the defendant's activities in the United States were more than merely preparatory to a securities fraud conducted elsewhere, and (2) these activities or culpable failures to act within the United States directly caused the claimed losses." *Itoba,* 54 F.3d at 122 (citations omitted); *see also Berger,* 322 F.3d at 193; *In re Vivendi Universal, S.A. Sec. Litig.,* No. 02 Civ. 5571(RJH), 2004 WL 2375830, at *3 (S.D.N.Y. Oct.22, 2004).

### 1. *Acts in the United States*

With respect to the first prong of the conduct test, Plaintiffs assert that Defendants engaged in conduct in the United States sufficient to establish subject matter jurisdiction. To buttress this argument, Plaintiffs point to their allegations that Bayer Corp. suppressed information regarding the adverse effects of Baycol in the United States; that Bayer Corp. issued a false press release and misleading SEC filings were made in the United States; and that the object of the fraud was to establish a United States market for Baycol. Defendants counter that

Plaintiffs have merely reframed matters this Court already considered and rejected in *Bayer I.* Defendants also contend Plaintiffs' arguments fail because the conduct relevant to establishing jurisdiction is the alleged misrepresentations or omissions made, not the underlying acts.

In securities fraud class actions, "courts assessing subject matter jurisdiction under the conduct test often have focused on the location from where allegedly false statements emanated and the circumstances of the statements' dissemination, since this conduct ... typically embodies the heart of the alleged fraud." *Vivendi,* 2004 WL 2375830 at *5 (collecting cases); *see Bersch,* 519 F.2d at 987 ("The fraud, if there was one, was committed by placing the allegedly false and misleading prospectus in the purchasers' hands."); *Froese v. Staff,* No. 02 Civ. 5744(RO), 2003 WL 21523979, at *2 (S.D.N.Y. July 7, 2003) ("[T]he fraud itself occurred, if at all, when the allegedly fraudulent statements were conceived, engineered, and published in Germany. It is these misstatements and not any activity which lead to the alleged misrepresentations which 'directly caused' the financial losses."); *Nathan Gordon Trust v. Northgate Exploration, Ltd.,* 148 F.R.D. 105, 108 (S.D.N.Y.1993) ("[T]he relevant conduct ... occurred ... where the alleged misleading information was authored.").

■ During the relevant period, the Complaint alleges that Bayer AG made all but two of the alleged material misstatements and omissions at issue. (Compl.¶¶ 96–97, 118.) The Bayer AG misstatements and omissions permeating the Complaint originated from Bayer AG in Germany and were included in Bayer AG press releases, statements by its Chairman, annual reports, stockholders' newsletters, its SEC Registration Statement and amendments thereto and a sub-

sequent SEC filing of its annual report. (Compl. ¶¶ 103–04, 118, 124–29, 132, 137–47; *see* Hawke Aff. Ex. A, Ex. B: Table Reflecting Origin of Communications.)

While this Court recognizes "that the situs of preparations for SEC filings should not be determinative," *Itoba,* 54 F.3d at 124, the Second Circuit has also acknowledged that in class actions, it is appropriate to consider whether the documents at issue "emanated from a foreign source." *Berger,* 322 F.3d at 195; *see also Bersch,* 519 F.2d at 986–90, 993–98; *Northgate,* 148 F.R.D. at 108; *cf. Itoba,* 54 F.3d at 123 (distinguishing between *Northgate* class action and *Itoba* "direct individual action" where Form 20–F was a "substantial and significant contributing cause" to plaintiff's purchase decision). Plaintiffs do not dispute that the "authorship, preparation and dissemination of the allegedly false information" was done by Bayer AG abroad. *See Northgate,* 148 F.R.D. at 108. Accordingly, this Court finds that these SEC filings, which "emanated from a foreign source," amid all the other foreign representations alleged throughout the Complaint, cannot support an extension of jurisdiction over an overwhelmingly foreign putative class. *Berger,* 322 F.3d at 195; *see generally Itoba,* 54 F.3d at 123; *Bersch,* 519 F.2d at 986–90, 993–98; *Northgate,* 148 F.R.D. at 108.

The two representations not attributable to Bayer AG were made by or on behalf of Bayer Corp. in October 2000 and August 2001. (Compl.¶¶ 96–97, 118.) The October statement by Plischke concerned anticipated Baycol sales. (Compl.¶¶ 96–97.) This representation occurred long before the withdrawal announcement in August 2001 and among many other more formal representations by Bayer AG. (Compl. ¶¶ 103–04, 118, 124–29, 132, 137–47; *see* Hawke Aff. Ex. A, Ex. B.) In August 2001, Bayer Corp. issued a press release that "contained statements virtually identical to Bayer AG's press release" and, as such, merely replicates a Bayer AG representation. (Compl.¶ 118.) These acts by themselves do not constitute "substantial acts in furtherance of the fraud." *Psimenos,* 722 F.2d at 1045; *see Berger,* 322 F.3d at 193–94 (finding jurisdiction based on where fraudulent scheme was "masterminded and implemented"); *Vivendi,* 2004 WL 2375830, at *3. Accordingly, this Court concludes that the "the fraud itself occurred, if at all, when the allegedly fraudulent statements were conceived, engineered, and published in Germany." *Froese,* 2003 WL 21523979, at *2; *see Bersch,* 519 F.2d at 987.

In addition to the reasons set forth above, this Court finds Plaintiffs' arguments unavailing on the following grounds. With respect to their suppression theory, Plaintiffs point to allegations identical to, or of the same character as, those previously determined insufficient to support jurisdiction. (Plaintiffs' Memorandum of Law in Opposition, dated Apr. 4, 2005 at 7.) In *Bayer I,* this Court concluded that the fact that Defendants "learned of Baycol's dangers from information collected in the United States ... is insufficient for subject matter jurisdiction." 2004 WL 2190357, at *17. Further, Plaintiffs improperly rely on many alleged misstatements or omissions regarding the adverse effects of Baycol made prior to August 2000, which this Court also found "were not materially misleading since the information [Defendants] possessed was not material." *Bayer I,* 2004 WL 2190357, at *11; *see also Pozniak v. Imperial Chem. Indus. PLC,* No. 03 Civ. 2457(NRB), 2004 WL 2186546, at *8 (S.D.N.Y. Sept.28, 2004) (rejecting jurisdiction based on fraudulent statements and omissions found not actionable). Finally, regarding Defendants' hopes of establishing a successful market for Baycol in the United States,

Plaintiffs have not pled any new facts altering this Court's conclusion in *Bayer I* that "mere commentary about activities occurring in the United States does not satisfy this Circuit's stringent conduct test, which focuses on defendants' *activities* in the United States." 2004 WL 2190357, at *17 (emphasis in original).[1]

2. *Tipping Factors*

■ Apart from Defendants' representations or omissions, Plaintiffs argue that Defendants' other conduct in the United States should tip the scales in favor of jurisdiction. *See EOC*, 147 F.3d at 129. In this circuit, courts "have found jurisdiction over a predominantly foreign securities transaction under the conduct test when, in addition to communications with or meetings in the United States, there has also been a transaction on a U.S. exchange, economic activity in the U.S., harm to a U.S. party, or activity by a U.S. person or entity meriting redress." *EOC*, 147 F.3d at 130; *see also Leonard v. Garantia Banking Ltd.*, No. 98 Civ. 4848(LMM), 1999 WL 944802, at *6 (S.D.N.Y. Oct.19, 1999). Courts may decline to extend jurisdiction based on these factors, however, where such an extension would be unreasonable in light of the circumstances presented. *EOC*, 147 F.3d at 131; *see also Interbrew S.A. v. Edperbrascan Corp.*, 23 F.Supp.2d 425, 431–32 (S.D.N.Y.1998).

"Congress may not be presumed to have prescribed rules governing activity with strong connections to another country, if the exercise of such jurisdiction would be unreasonable in the light of established principles of U.S. and international law." *EOC*, 147 F.3d at 130–31. Plaintiffs do not dispute that during the Class Period, United States investors held only eight percent of Bayer AG's shares, the balance being held in Germany and in over 130 other countries. (Hawke Aff. Ex. A.) It is also undisputed that jurisdiction extends to the United States purchasers of Bayer AG securities and, as such, the claims of those plaintiffs will proceed irrespective of jurisdiction over Foreign Purchasers. Based on the above, this Court concludes that resting jurisdiction on this eight percent United States investment raises concerns that a "very small tail may be wagging an elephant" of Foreign Purchasers, *IIT*, 519 F.2d at 1017–18 n. 31; *see also Berger*, 322 F.3d at 195–96; *Bersch*, 519 F.2d at 987–90, 993–98, and would result in an unreasonable extension of subject matter jurisdiction. *See EOC*, 147 F.3d at 129 (finding no subject matter jurisdiction where jurisdictional test would ordinarily be satisfied because surrounding circumstances do not support such extension); *Interbrew*, 23 F.Supp.2d at 432 (same).

Because this Court concludes that Plaintiffs have not satisfied the first part of the conduct test, it need not consider whether Defendants' United States activities or culpable failures to act directly caused Plaintiffs' losses.[2]

---

1. Because this Court finds Plaintiffs' suppression theory unavailing, this Court denies Plaintiffs' request for leave to amend their Complaint with the further allegations set forth in their surreply as such amendment would be futile. (Plaintiffs' Surreply, dated May 6, 2005, at 2.) *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (leave to amend may be denied where futile).

2. Plaintiffs argue that their losses were directly caused by a fraud on the market stemming from Defendants' misstatements and omissions. The Second Circuit has not addressed whether fraud on the market suffices to demonstrate the direct causal relationship required to establish subject matter jurisdiction under the conduct test. *Cf. Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 988–89, 99 L.Ed.2d 194 (1988) (fraud on the market applies to establish a rebuttable presump-

## B. Effects Test

■ Plaintiffs' argument for subject matter jurisdiction under the effects test is also unavailing. On the prior motion to dismiss, Plaintiffs did not raise any argument under the effects test. *Bayer I*, 2004 WL 2190357, at \*17. However, Plaintiffs now raise the effects test because they "came to the conclusion that we should offer [the Court] something on that because it may be relevant here." (Transcript of Oral Argument on May 17, 2005, at 37–38.) Consistent with that perfunctory contention, Plaintiffs have not shown that Defendants' "wrongful conduct had a substantial effect in the United States upon United States citizens." *Berger*, 322 F.3d at 193; *IIT*, 519 F.2d at 1016.

Plaintiffs assert that when the value of Bayer AG equity securities declined, United States citizens who held Bayer AG ADRs were profoundly affected. As discussed above, Plaintiffs do not dispute that during the Class Period, United States investors held only eight percent of Bayer AG's shares. (Hawke Aff. Ex. A.) The remaining shares were held in Germany and over 130 other countries. (Def. Hawke Aff. Ex. A.) Because United States investors held "an exceptionally small percentage" of the total number of shares, Plaintiffs cannot demonstrate a substantial or significant effect upon United States citizens to support jurisdiction over the Foreign Purchasers. *Froese*, 2003 WL 21523979, at \*2; *see also IIT*, 519 F.2d at 1016–17; *cf. In re Gaming Lottery Sec. Litig.*, 58 F.Supp.2d 62, 75 (S.D.N.Y.1999) (finding subject matter over foreign purchasers in class action where over 51% of shares were held by United States residents).

The magnitude of Bayer AG's conduct abroad and the overwhelming number of Foreign Purchasers affected thereby militate against a finding that "Congress would have wished the precious resources of the United States courts and law enforcement agencies to be devoted" here. *Berger*, 322 F.3d at 192. With respect to the Foreign Purchasers, "[f]raud there might have been, and [the Foreign Purchasers] may very well have been damaged by its perpetration. But the dispute here presented is rightfully resolved in the court of another land." *Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S.A.*, 606 F.2d 5, 10 (2d Cir.1979).

Accordingly, this Court concludes that subject matter jurisdiction does not reach the Foreign Purchasers. This determination, however, does not affect this Court's subject matter jurisdiction over the claims of United States purchasers of Bayer AG securities. Indeed, in the class action context where foreign purchasers have not demonstrated a sufficient connection to the United States under the conduct or effects tests, it is appropriate to dismiss the

---

tion of reliance in Rule 10b–5 cases); *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 172 (2d Cir.2005) (if properly pled, fraud on the market may be invoked to establish loss causation under Section 10(b) and Rule 10b–5). In light of this Court's conclusion that Plaintiffs have not established the conduct necessary to extend subject matter jurisdiction over the Foreign Purchasers, the Court declines to engage in a purely advisory discussion of Plaintiffs' fraud on the market theory. This Court notes, however, as it did in *Bayer I*, that when considered by other district courts, this theory has been rejected. 2004 WL 2190357 at \*18; *see Tri–Star Farms, Ltd. v. Marconi, PLC*, 225 F.Supp.2d 567, 579 (W.D.Pa.2002) ("Employing the 'fraud-on-the-market' doctrine to satisfy the conduct test in this type of class action lawsuit involving overwhelmingly foreign transactions would extend the jurisdictional reach of the securities laws too far."); *In re Baan Co. Sec. Litig.*, 103 F.Supp.2d 1, 10 (D.D.C.2000) ("[E]mploying [fraud on the market] to fulfill the requirements of the conduct test would extend the reach of the 1934 Act too far.").

claims of foreign purchasers for lack of subject matter jurisdiction and retain the claims of domestic purchasers. *See Bersch*, 519 F.2d at 989–90 (securities fraud class action where subject matter jurisdiction exists over domestic claims and not foreign claims); *Pozniak*, 2004 WL 2186546, at *8 (same); *Northgate*, 148 F.R.D. at 108 (same).

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the claims of the Foreign Purchasers pursuant to Rule 12(b)(1) is granted with prejudice.